**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| FREESTATE JUSTICE<br>2601 N. Howard Street, Suite 120,<br>Baltimore, MD 21218,<br><br>       *Plaintiff*,<br><br>  v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY<br>COMMISSION<br>131 M Street NE<br>Washington, D.C. 20507,<br><br>   and<br><br>ANDREA LUCAS, in her official capacity as<br>ACTING CHAIR OF THE EQUAL<br>EMPLOYMENT OPPORTUNITY<br>COMMISSION<br>131 M Street NE<br>Washington, D.C. 20507,<br><br>       *Defendants*. | **Civil Case No. _____** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

  Plaintiff FreeState Justice brings this action for declaratory and injunctive relief against Defendants Equal Employment Opportunity Commission and Andrea Lucas, in her official capacity as Acting Chair of the Equal Employment Opportunity Commission. Plaintiff alleges as follows:

**INTRODUCTION**

  1. From the day it opened its doors in July of 1965, and for the past sixty years, the Equal Employment Opportunity Commission has been responsible for enforcing the Nation's federal workplace antidiscrimination laws.

2.      The EEOC is tasked with addressing unlawful workplace discrimination in almost every aspect of employment, including in the contexts of hiring, pay, benefits, assignments, promotions, hostile work environments, discipline, firing, and layoffs. The EEOC also addresses employer retaliation against workers who oppose discrimination or support others who do.

3.      Its mission to redress discrimination and retaliation and to advance equal opportunity in the workplace stems from the basic principle that job applicants, employees, and employers alike benefit from workplaces free from discrimination.

4.      The EEOC's charge-investigation process is one of the foundational tools by which the Commission fulfills this promise. Under Title VII of the Civil Rights Act of 1964, people who have been subjected to unlawful workplace discrimination, or their advocates, may file a charge of discrimination with the EEOC—indeed, doing so is a precondition to filing a federal employment-discrimination lawsuit. The EEOC, in turn, serves those charges on the employers, investigates the charges, resolves matters through conciliation or settlement where possible, and, in some circumstances, files lawsuits in federal court to vindicate the charging parties and advance the public interest.

5.      But the EEOC has now abdicated this core duty. In derogation of its statutory and constitutional obligations, the EEOC has foreclosed transgender workers from the full set of Title VII-mandated charge-investigation and other enforcement protections that all other charging parties enjoy.

6.      First, beginning in January 2025, the EEOC halted the charge-investigation process for all charges tied to sexual orientation or gender identity.

7.      Soon after, the EEOC moved to dismiss with prejudice its own employment-discrimination lawsuits brought on behalf of transgender charging parties, which it had been

2

prosecuting in federal courts across the country since last year. The cases that the EEOC sought to abandon concerned transgender workers who had been subjected to egregious conditions in the workplace: slurs and grossly derogatory statements, graphic sexual comments and unwanted physical touching, misgendering, unfavorable shift changes, and termination after disclosing their gender identity—often in combination.

8.    In April, the EEOC directed that all charges of gender-identity discrimination be categorically classified as meritless and suitable for dismissal.

9.    And now, the EEOC purports to accept for processing only certain kinds of charges brought by transgender charging parties—standalone hiring, firing, and promotion claims—but no others.

10.    As it operates today, the EEOC has adopted a policy (the "Trans Exclusion Policy") under which it has ceased carrying out its statutorily mandated charge-investigation process with respect to all other charges tied to gender-identity discrimination, including harassment and the many other adverse employment actions outside of hiring, firing, and promotion, as well as retaliation claims. Even hiring, firing, and promotion charges may be excluded from processing when brought alongside charges alleging harassment, other excluded claims, or retaliation. And the EEOC has ceased litigating any and all employment-discrimination cases in federal court on behalf of transgender claimants, as its dismissals with prejudice show.

11.    The EEOC's charge-filing process is not just a formality on the road to federal litigation, but an important set of federal protections designed to address unlawful discrimination. It is an opportunity for information-gathering by an EEOC investigator that may help a charging party find pro bono legal assistance. It can lead to settlement negotiations that result in policy change, monetary compensation, and reinstatement. And it may lead to the EEOC undertaking

litigation to vindicate a charging party's and others' rights to be protected from illegal workplace discrimination.

12.    The Trans Exclusion Policy deprives transgender workers of the full set of charge-investigation and other enforcement protections that the EEOC provides to other workers. Pursuant to that policy, the EEOC is refusing to process viable Title VII charges simply because of who the charging party is. Consider, for example, the transgender worker who files a charge of discrimination with the EEOC after a years-long barrage of on-the-job anti-trans insults and slurs, threats of sexual and lethal violence, and physical attacks. *See, e.g.*, *Eller v. Prince George's Cnty. Pub. Sch.*, 580 F. Supp. 3d 154, 173-76 (D. Md. 2022) (denying—on these facts—employer's motion for summary judgment on hostile-work-environment claim). Before the Trans Exclusion Policy, a charge alleging such facts would have led the EEOC to process and investigate the charge, which in turn might have yielded a finding by the EEOC that there was reasonable cause to believe the charging party had been subject to unlawful treatment, a lawsuit, favorable decision at summary judgment, and a settlement. Today? Under the Trans Exclusion Policy, the EEOC would not investigate, issue a cause finding, attempt to settle, or take any other step to process the charge. All because the charging party is transgender.

13.    Defendants' actions are rooted in Defendants' animus against transgender people. The Trans Exclusion Policy is part and parcel of this Administration's agenda to erase and unlawfully deny protections to transgender people in the provision of government services and across all aspects of civic life.

14.    The EEOC's Trans Exclusion Policy violates Title VII, the Equal Protection Clause, and the Administrative Procedure Act.

## PARTIES

15.     Plaintiff FreeState Justice is Maryland's oldest statewide legal-services nonprofit organization serving the state's LGBTQ+ population, including through the provision of free legal services, legislative advocacy, and education and outreach programming. It is a 501(c)(3) organization headquartered in Baltimore, Maryland.

16.     Defendant Equal Employment Opportunity Commission is a federal agency with its headquarters at 131 M Street NE, Washington, D.C. 20507.

17.     Defendant Andrea Lucas is Acting Chair of the EEOC. In 2020, Defendant Lucas was nominated by President Donald Trump and confirmed by the Senate to a five-year term ending July 1, 2025. President Trump appointed her as Acting Chair on January 21, 2025. On March 25, 2025, President Trump renominated her to a second term. Since July 1, 2025, when her first term expired, Acting Chair Lucas has been serving a holdover term pending Senate confirmation of her nomination for a second term. She is sued in her official capacity.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, namely, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; the Administrative Procedure Act, 5. U.S.C. §§ 701 *et seq.*; and the U.S. Constitution.

19.     This Court has the authority to grant the declaratory and injunctive relief requested by Plaintiff under Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the Administrative Procedure Act, 5. U.S.C. §§ 701 *et seq.*; and the Court's inherent equitable authority.

20.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Plaintiff resides in this district and no real property is involved in the action.

## FACTUAL BACKGROUND

### The Equal Employment Opportunity Commission

21.     The Civil Rights Act of 1964 is among the most sweeping civil-rights laws in this Nation's history. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 649-50 (2020) ("In our time, few pieces of federal legislation rank in significance with the Civil Rights Act of 1964.")

22.     Title VII of the Act bans discrimination in employment on the basis of race, color, religion, sex, or national origin. 42 U.S.C. §§ 2000e *et seq*. Title VII's protections against sex discrimination include protections against discrimination tied to sexual orientation or gender identity.

23.     Title VII also established the Equal Employment Opportunity Commission. *Id.* § 2000e-4(a).

24.     The EEOC is the primary agency responsible for investigating charges of discrimination under federal laws that prohibit workplace discrimination and litigating cases of employment discrimination in the public interest.

25.     As the Supreme Court has recognized, the EEOC is "central to the federal policy of prohibiting wrongful discrimination in the Nation's workplaces and in all sectors of economic endeavor." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013). Indeed, "[w]hen the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination." *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 326 (1980).

26.     The laws that the EEOC is responsible for enforcing include Title VII, including the Pregnancy Discrimination Act; the Equal Pay Act of 1963; the Age Discrimination in Employment Act of 1967; Sections 501, 504, and 505 of the Rehabilitation Act of 1973; Titles I

and V of the Americans with Disabilities Act of 1990; Title II of the Genetic Information Nondiscrimination Act of 2008; and the Pregnant Workers Fairness Act of 2022.[1]

27.     Together, these laws prohibit employment discrimination on the basis of race, color, religion, sex (including pregnancy, sexual orientation, and gender identity), national origin, age, disability, and genetic information.

28.     The EEOC enforces workplace discrimination in the many contexts in which it arises, including hiring and firing, promotions and demotions, pay and benefits, disparate or unwarranted discipline, undesirable "lateral" transfers or shift changes, harder or less desirable work assignments, and exclusion from trainings, among other things.

29.     Workplace harassment is also a form of employment discrimination, *see, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986), and takes many forms, including verbal or physical threats or intimidation, name calling, and slurs.

30.     These laws also prohibit retaliation against an employee who reports or otherwise opposes conduct that is or might be discriminatory under these laws, or who participates in related proceedings, including by supporting employees who advocate for their rights under these laws.

31.     The EEOC is a bipartisan Commission consisting of five presidentially appointed, Senate-confirmed Commissioners, each appointed to a five-year term. *See* 42 U.S.C. § 2000e-4(a). The terms are staggered so that one member's term ends each year. *Id.*

32.     The President designates one Commissioner as the Chair, who is "responsible on behalf of the Commission for the administrative operations of the Commission." *Id.*

33.     Congress specified that the Commission requires a quorum of three members to exercise its powers. 42 U.S.C. § 2000e-4(c). Like all agencies, the EEOC "has no power to act . . .

---

[1] *See Equal Employment Opportunity Laws*, EEOC, https://perma.cc/AXY5-4KDF.

unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374 (1986).

34.     On January 27, 2025—before the end of their statutorily designated terms—President Trump removed Commissioners Charlotte Burrows and Jocelyn Samuels. Since then, Burrows and Samuels have not been able to perform their duties and the EEOC has operated with only two Commissioners, Acting Chair Andrea Lucas and Commissioner Kalpana Kotagal.

35.     The EEOC has therefore not had a quorum capable of exercising many of the Commission's powers since January 27, 2025.

### The EEOC's enforcement duties

36.     Congress entrusted the EEOC with the crucial task of investigating charges of discrimination filed by workers alleging violation of federal workplace civil-rights laws and litigating employment-discrimination cases in the public interest.

37.     When a person has experienced unlawful discrimination in the workplace, that person or someone acting on their behalf may file a charge of discrimination with the EEOC—a "signed statement asserting that an employer, union or labor organization engaged in employment discrimination" that "requests EEOC to take remedial action." 42 U.S.C. § 2000e-5(b).[2]

38.     Filing a charge with the EEOC is a mandatory prerequisite for anyone asserting rights under Title VII and must be satisfied if a worker wishes to file suit against their employer in court.[3] 42 U.S.C. § 2000e-5(f)(1); *see Ft. Bend Cnty. v. Davis*, 587 U.S. 541, 543 (2019).

---

[2] *See Filing a Charge of Discrimination*, EEOC, https://perma.cc/JMX5-99JC.

[3] In many states, an individual may alternatively file a charge of discrimination with state or local Fair Employment Practices Agencies, which process charges for the EEOC, as discussed in more detail below. Employees of the federal government must complete a separate exhaustion process before proceeding to the EEOC for an adjudication or filing a lawsuit in a federal court. *See* EEOC, *Federal EEO Complaint Processing Procedures*, https://perma.cc/R59J-ZAZX.

39.     The filing of an EEOC charge of discrimination triggers several steps in the charge-investigation process.

40.     For purposes of processing, EEOC staff categorize all newly filed charges into one of three categories according to whether the EEOC determines that there is reasonable cause to believe discrimination occurred, in accordance with the EEOC's Priority Charge Handling Procedures.[4] "A" charges are "charges that EEOC concludes will likely result in a reasonable cause determination." "B" charges are "charges for which EEOC requires additional information to determine whether its investigation of a charge is likely to result in a reasonable cause determination, and other charges for which EEOC cannot judge the merits . . . at charge receipt." "C" charges are "charges for which EEOC has obtained sufficient information to conclude that a reasonable cause determination is not likely."[5] "C" charges may be dismissed at intake or soon thereafter.[6]

41.     Title VII requires that within ten days of receipt of the charge of discrimination, the EEOC must serve the employer notice of the charge, including details related to the "date, place and circumstances of the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(b).

42.     For charges marked "A" or "B," the EEOC may offer the parties an opportunity for mediation before initiating a full investigation. If the parties agree, the EEOC schedules a mediation to be conducted by a trained and experienced mediator at no cost to the charging party or the employer.

---

[4] *See* Gov't Accountability Off., GAO-23-106245, Report to the Republican Leader, Comm. on Educ. & Labor, H. Rep., Equal Employment Opportunity Commission: Oversight of the Length of the Charge Intake Process is Needed 5 (2022), https://perma.cc/VXQ8-FQR4.
[5] *Id.*
[6] *Id.*

43.    Mediation is often the fastest way to resolve a charge. On average, it takes less than three months to resolve a charge through mediation, whereas it can take months longer for a charge to be investigated.

44.    For charges not resolved via mediation at the outset of the charge-investigation process, the EEOC must investigate the charge "as promptly as possible and, so far as practicable," within 120 days of the charge being filed (or, in certain circumstances, within 120 days of the EEOC being authorized to take action with respect to the charge). *Id.*

45.    During an investigation, the EEOC typically asks the employer and the charging party to provide information. It requests a position statement from the employer, encouraging the employer to raise any material factual or legal defenses. The EEOC may ask the charging party for a written rebuttal to the position statement or conduct additional interviews of the charging party. The EEOC may also ask the employer to submit personnel policies, the charging party's personnel files, personnel files of other individuals, and other relevant documents and information. It may further request that the employer permit an on-site visit or provide contact information for its employees or otherwise make them available for interviews with an EEOC investigator.[7]

46.    Upon completing the investigation, EEOC staff determine whether or not there is reasonable cause to believe discrimination occurred.

47.    When the EEOC determines that "there is reasonable cause to believe" that discrimination occurred in violation of Title VII or one of the other statutes enforced by the EEOC, the agency is obligated by statute to attempt to remediate unlawful employment practices "by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e-5(b).

48.    If the EEOC is unable to secure an acceptable conciliation agreement with the

---

[7] *See What You Can Expect After a Charge Is Filed*, EEOC, https://perma.cc/N6P3-5Q9G.

employer, the agency may initiate a civil action in federal court against the employer. *Id.* § 2000e-5(f)(1).

49.     If the EEOC declines to file a federal lawsuit in court against the charging party's employer within 180 days of the filing of a charge of discrimination, the EEOC must notify the aggrieved party and issue the party a right-to-sue notice. *Id.*

50.     Likewise, if the Commission determines, after investigating, that "there is not reasonable cause to believe that the charge is true," it must dismiss the charge, notify both the aggrieved party and the employer, and issue the party a right-to-sue notice. *Id.* § 2000e-5(b).

51.     As explained above, an employee cannot file a Title VII lawsuit against their employer without first moving through the EEOC's charge-filing process and obtaining a right-to-sue notice.

52.     To help fulfill its enforcement responsibilities, the EEOC contracts with what it terms Fair Employment Practices Agencies ("FEPAs")—state and local agencies that are also responsible for enforcing their own state and local employment-discrimination laws.[8]

53.     Through work-sharing agreements between the EEOC and FEPAs, FEPAs assume responsibility for receiving charges of discrimination under Title VII or the other federal laws that the EEOC enforces, including investigating and resolving the charges through the FEPAs' own processes. Under the work-sharing agreements, the EEOC makes payments to the FEPAs based on the number of charges that the FEPA processes for the EEOC.

**The EEOC's enforcement of Title VII to address and prevent discrimination based on sex, including gender identity**

54.     Since at least 2011, the EEOC has interpreted Title VII's bar on sex-based discrimination and harassment to encompass discrimination based on sexual orientation and

---

[8]*Fair Employment Practices Agencies (FEPAs) and Dual Filing*, EEOC, https://perma.cc/34TQ-PPYW.

gender identity.

55.     In 2012, in *Macy v. Department of Justice*, the EEOC held in an administrative adjudication that discrimination based on an employee's transgender status is sex discrimination in violation of Title VII. *See* EEOC Appeal No. 0120120821, 2012 WL 1435995 (Apr. 20, 2012). And in 2015, the EEOC determined that discrimination based on sexual orientation is sex-based discrimination in violation of Title VII. *See Baldwin v. Dep't of Transp.*, EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 15, 2015). The EEOC has since repeatedly affirmed this interpretation of Title VII.

56.     The EEOC has accordingly recognized for at least a decade that harassment based on an employee's gender identity that creates a hostile work environment violates Title VII's prohibition on sex discrimination. *See, e.g.*, *Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133385, 2015 WL 1607756 (Apr. 1, 2025) (repeated and intentional use of pronouns inconsistent with employee's gender is sex discrimination).

57.     Confirming the EEOC's interpretation, in *Bostock*, the Supreme Court held that Title VII's prohibition against employment discrimination "because of . . . sex" encompasses discrimination based on sexual orientation and gender identity. 590 U.S. at 683.

58.     In other words, *Bostock* cemented protections for LGBTQ+ workers that the EEOC had already recognized for years.

59.     The EEOC's recognition of Title VII's protections against employment discrimination for LGBTQ+ workers is reflected in official EEOC guidance documents, including its Enforcement Guidance on Harassment in the Workplace ("Anti-Harassment Guidance"),[9] and

---

[9] EEOC, Enforcement Guidance on Harassment in the Workplace (2024), https://perma.cc/8CEA-HZK8.

in its strategic enforcement plans, including its Strategic Enforcement Plan (SEP) for Fiscal Years 2024-2028.[10]

60.    On April 29, 2024, following a notice-and-comment period, the Commission approved by a majority vote and published the Anti-Harassment Guidance, which addresses the longstanding federal legal protections for LGBTQ+ employees and explains the application of Title VII's prohibition on sex harassment against LGBTQ+ workers in line with federal-court precedents across the country.[11]

61.    In September 2023, following a notice-and-comment period, the Commission approved by a majority vote and published the Strategic Enforcement Plan for Fiscal Years 2024-2028, which identifies "preventing and remedying discrimination against LGBTQI+ individuals" as a "key priority for the EEOC, as such individuals are often vulnerable and have historically been underserved."[12]

**Acting Chair Lucas halts EEOC enforcement of Title VII protections for transgender workers**

62.    On January 20, 2025, President Trump issued Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." 90 Fed. Reg. 8,615 (Jan. 20, 2025).

63.    Rejecting the very existence of transgender people, the Executive Order purports to establish "the policy of the United States to recognize two sexes, male and female." Executive Order 14168, § 2. The executive order announces that the Administration will use "language and policies that recognize women are biologically female, and men are biologically male." *Id.* § 1.

---

[10] EEOC Strategic Enforcement Plan Fiscal Years 2024-2028 (2023), https://perma.cc/M9BK-JLDR.
[11] Anti-Harassment Guidance, *supra* note 9.
[12] Strategic Enforcement Plan, *supra* note 10.

64.     To that end, the Executive Order provides that "the Executive Branch will enforce all sex-protective laws to promote this reality." *Id.* § 2. It provides definitions of terms like "Sex," "Women," "Men," and "Gender Identity," among others, consistent with that view. *Id.*

65.     The Executive Order instructs all federal agencies and federal employees to effectively ignore all legal protections for transgender people, and to cease formal recognition of transgender people and, practically, any person who is not cisgender.[13] For example, it requires federal agencies to "enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id.* § 3(b). It directs agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," and to "cease issuing such statements, policies, regulations, forms, communications or other messages." *Id.* § 3(e). It requires that "[a]gency forms that require an individual's sex shall list male or female, and shall not request gender identity."[14] *Id.*

66.     On January 28, within hours of the EEOC losing its quorum through President Trump's removal of two Commissioners,[15] EEOC Acting Chair Lucas issued a press release "announc[ing] that the agency is returning to its mission of protecting women from sexual

---

[13] "Cisgender" describes someone whose gender identity aligns with the sex they were assigned at birth.

[14] Federal courts, including in this District, have declared portions of the Executive Order unconstitutional, including by finding that it is based on animus against transgender people. *See, e.g.*, *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 446-49 (D. Md. 2025), *appeal docketed*, No. 25-1279 (4th Cir. Mar. 24, 2025); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1277-78 (W.D. Wash. 2025) (The Executive Order "reflects a bare desire to harm a politically unpopular group, as its underlying actual purpose. Its language . . . denies and denigrates the very existence of transgender people—despite the evidence that they do exist and have as long as human history has been recorded." (citation modified)), *appeal docketed*, No. 25-1922 (9th Cir. Mar. 24, 2025).

[15] As noted above, there are currently just two sitting EEOC Commissioners: Acting Chair Andrea Lucas and Commissioner Kalpana Kotagal.

harassment and sex-based discrimination in the workplace by rolling back the Biden administration's gender identity agenda."[16]

67.    In the release, Lucas identified several actions that she had taken in response to Executive Order 14168. They include, among other things: announcing "one of her priorities—for compliance, investigations, and litigation—is to defend the biological and binary reality of sex and related rights"; "[e]nd[ing] the use of the 'X' gender marker during the intake process for filing a charge of discrimination"; "[d]irect[ing] the modification of the charge of discrimination and related forms to remove 'Mx.' from the list of prefix options"; and "[r]emov[ing] materials promoting gender ideology on the Commission's internal and external websites and documents, including webpages, statements, social media platforms, forms, trainings, and others," or, for public-facing materials that cannot be immediately removed or revised, placing "a banner . . . to explain why the item has not yet been brought into compliance."[17]

68.    Although Lucas acknowledged that she "cannot unilaterally remove or modify" various "'gender identity'-related documents" promulgated by the EEOC, including the Anti-Harassment Guidance and Strategic Enforcement Plan,[18] she nevertheless registered her "vocal . . . opposition" to these Commission documents.[19]

69.    Lucas expressed disdain for the Anti-Harassment Guidance, including its reiteration that "harassing conduct includes 'repeated and intentional use of a name or pronoun inconsistent with [an] individual's known gender identity.'"[20] According to Lucas, "the EEOC

---

[16] Press Release, Andrea Lucas, Acting Chair, EEOC, Removing Gender Ideology and Restoring the EEOC's Role of Protecting Women in the Workplace (Jan. 28, 2025), https://perma.cc/J3JQ-YK67.
[17] Id.
[18] Id.
[19] Id.
[20] Id. (alterations in original).

15

betrayed its mission by issuing the 'gender identity' portions of the [Anti-Harassment Guidance]."[21]

70.     Under Lucas's leadership, and acting without a quorum, the Commission has taken a number of actions to cease enforcing transgender workers' legal protections against discrimination under Title VII.[22]

71.     Beginning on February 13, the EEOC moved to dismiss—with prejudice—at least seven cases it brought on behalf of transgender or non-binary workers alleging unlawful discrimination and harassment based on their gender identity, and, in one case, a transgender charging party asserting only a claim of unlawful retaliation.

72.     In all these cases, the EEOC represented that "the EEOC's continued litigation of its claims in this action may be inconsistent with" Executive Order 14168 and related guidance issued by the Office of Personnel Management.[23]

73.     The cases include:

        a.     *EEOC v. Boxwood Hotels, LLC*: The EEOC filed a complaint in the Western District of New York on September 25, 2024, alleging that the defendant employer violated Title VII by subjecting the charging party, Dylan Bringuel, to a hostile work environment because Bringuel is transgender, including by "subjecting Bringuel to slurs, anti-transgender statements, and misgendering."[24]

---

[21] *Id.*

[22] While one federal district court has vacated portions of the Anti-Harassment Guidance related to sexual orientation and gender identity, *see Texas v. EEOC*, No. 2:24-cv-173-Z, 2025 WL 1414332 (N.D. Tex. May 15, 2025), the Lucas-led EEOC dismissed its cases on behalf of transgender workers *before* the court's decision, and, notably, the district court declined to issue an injunction barring the EEOC from "interpreting, applying, or enforcing" Title VII with regard to gender identity. *See id.* at *16.

[23] On January 29, 2025, the Office of Personnel Management issued a memorandum instructing all departments and agencies to give effect to the Executive Order. *See* Memo from Charles Ezell, Acting Director, U.S. OPM, Initial Guidance Regarding President Trump's Executive Order *Defending Women* to Heads and Acting Heads of Departments and Agencies (Jan. 29, 2025), https://perma.cc/6AZA-DXW2.

[24] Compl., Dkt. 1, *EEOC v. Boxwood Hotels, LLC*, No. 1:24-cv-00902-LJV (W.D.N.Y. Sept. 25, 2024).

The complaint alleges that, among other things, Bringuel's manager "referr[ed] to Bringuel as a 'Transformer,'" made statements "that there is something wrong with transgender people like Bringuel," and "repeatedly and intentionally misgendered and dehumanized Bringuel," including by referring to Bringuel as "it" when speaking with other employees.[25] On February 14, 2025, the EEOC moved to dismiss the case with prejudice, citing the change in policy announced in Executive Order 14168.[26]

       b.    *EEOC v. Harmony Hospitality, LLC*: The EEOC filed a complaint in the Middle District of Alabama on June 13, 2024, alleging that the defendant discriminated against the charging party, D.A., a former employee of the defendant, because of D.A.'s sex, sexual orientation, and gender identity.[27] The complaint alleges that a few months into D.A.'s employment, his manager learned that his appearance did not always conform to male gender stereotypes. The manager then scheduled D.A. to work night shifts because he "needed to be 'hidden.'"[28] That same day, the manager learned that D.A. is gay and identifies as a non-binary male.[29] D.A. was fired within hours.[30] A scheduling order had been issued in the case and one deposition had been noticed as of January 2025. Then, on February 13, the EEOC moved to dismiss the case with prejudice, citing the change in policy announced in Executive Order 14168.[31]

---

[25] *Id.* at 8-9.
[26] Unopposed Mot. to Dismiss EEOC's Compl., Dkt. 32, *Boxwood Hotels* (W.D.N.Y. Feb. 14, 2025).
[27] Compl., Dkt. 1, *EEOC v. Harmony Hospitality, LLC*, No. 1:24-cv-00357-CWB (M.D. Ala. June 13, 2024), at 1.
[28] *Id.* at 4.
[29] *Id.* at 3-4.
[30] *Id.*
[31] Joint Mot. to Dismiss EEOC Litigation, Dkt. 23, *Harmony Hospitality* (M.D. Ala. Feb. 13, 2025).

c.      *EEOC v. Starboard Group, Inc.*: The EEOC filed suit in the Southern District of Illinois on October 1, 2024, alleging that several former employees of a Wendy's franchise in Carbondale, Illinois, were subjected to ongoing unlawful sex-based harassment because they are transgender.[32] One employee was subjected to near-daily "misgendering, graphic sexual comments, invasive questions, denial of access to the men's bathroom, and other verbal harassment," including, among other things, his supervisor "demand[ing] to know if he had a penis" and coworkers "referring to the employee as 'it.'"[33] Employees tried "to touch [him] inappropriately."[34] Another employee experienced "constant[] sex-based harassment consisting of misgendering, physical harassment, denial of access to the men's bathroom, and graphic sexual comments."[35] One coworker asked the employee, "How do you have sex with your girlfriend?" Another called him "fucking gross." A supervisor once "kissed [him] in the presence of others and said: 'Now they can say we are dating.'"[36] A third employee was likewise "constantly subjected to sex-based harassment consisting of misgendering, and graphic sexual comments."[37] On February 14, 2025, the EEOC filed a motion to dismiss the case with prejudice, citing the change in policy announced in Executive Order 14168.[38]

---

[32] Compl., Dkt. 1, *EEOC v. Starboard Group, Inc.*, No. 3:24-cv-02260-NJR (S.D. Ill. Oct. 1, 2024).
[33] *Id.* at 4.
[34] *Id.* at 6.
[35] *Id.* at 5.
[36] *Id.*
[37] *Id.* at 5-6.
[38] Pl. EEOC's Mot. to Dismiss EEOC Litigation, Dkt. 12, *Starboard Group* (S.D. Ill. Feb. 14, 2025).

d.      *EEOC v. Sis-Bro, Inc.*: The EEOC filed a complaint in the Southern District of Illinois on March 28, 2024, on behalf of a transgender woman who was subjected to a hostile work environment from the time that she began to transition, in 2018, until the time that she separated from her employer, in 2021.[39] The complaint alleged that the charging party was repeatedly criticized for obtaining gender-affirming care, misgendered, and treated less favorably than colleagues.[40] The complaint further alleged that the charging party's supervisor permitted a coworker to sexually harass the charging party, including by exposing his genitals to her, touching her breasts, and making explicit sexual comments to her on many occasions.[41] The court denied Sis-Bro's motion to dismiss, finding that the EEOC had ably stated claims for relief under Title VII.[42] Then, on February 14, 2025, the EEOC moved to dismiss the case with prejudice, citing the change in policy announced in Executive Order 14168.[43]

e.      *EEOC v. Lush Handmade Cosmetics, LLC*: The EEOC filed a complaint in the Northern District of California on September 30, 2024, alleging that Lush Cosmetics subjected several employees to a hostile work environment because of their sex, sexual orientation, and gender identity.[44] The complaint described a years-long pattern of a store manager making "crude and salacious comments" to his direct reports, including comments related to their sex, sexual

---

[39] Compl., Dkt. 1, *EEOC v. Sis-Bro, Inc.*, No. 3:24-cv-00968 (S.D. Ill. Mar. 28, 2025).
[40] *Id.* ¶¶ 13-14.
[41] *Id.*
[42] Mem. & Order, Dkt. 28, *Sis-Bro, Inc.* (S.D. Ill. Aug. 16, 2024).
[43] Pl. EEOC's Mot. to Dismiss EEOC Litigation, Dkt. 63, *Sis-Bro, Inc.* (S.D. Ill. Feb. 14, 2025).
[44] Compl., Dkt. 1, *EEOC v. Lush Handmade Cosmetics, LLC*, No. 5:24-cv-06859 (N.D. Cal. Sept. 30, 2024).

orientation, and gender identity.[45] On February 14, 2025, the EEOC filed a stipulation to stay all deadlines and dismiss the case with prejudice, citing the change in policy announced in Executive Order 14168.[46]

        f.     *EEOC v. Reggio's Pizza, Inc.*: The EEOC filed a complaint in the Northern District of Illinois on September 25, 2024, alleging that the charging party, a Black transgender woman who was a former employee of the defendant restaurant, was discharged after complaining to a manager about "highly-offensive sex-based and race-based harassment" that she "reasonably believed to be unlawful."[47] The former employee's retaliation claims were the sole claims alleged in the complaint. On February 14, 2025, the EEOC moved to dismiss the case with prejudice, citing the change in policy announced in Executive Order 14168.[48]

        g.     *EEOC v. Brik Enterprises, Inc.*: The EEOC filed a complaint in the Eastern District of Michigan on October 25, 2024, alleging that the defendant fast food companies retaliated against the charging party—Asher Lucas, a transgender man and former shift manager—and three of his colleagues, firing them after they complained that Lucas was being harassed.[49] The defendants' manager permitted other employees to harass Lucas, including by repeatedly and purposefully misgendering him and making other derogatory anti-transgender comments to

---

[45] *Id.* at 4.
[46] Stip. to Stay Pending Deadlines & Dismiss with Prejudice, Dkt. 25, *Lush Handmade Cosmetics* (N.D. Cal. Feb. 14, 2025).
[47] Compl., Dkt. 1, *EEOC v. Reggio's Pizza, Inc.*, No. 1:24-cv-08910 (N.D. Ill. Sept. 25, 2024).
[48] Pl. EEOC's Mot. to Dismiss EEOC Litigation, Dkt. 20, *Reggio's Pizza, Inc.* (N.D. Ill. Feb. 14, 2025).
[49] Compl., Dkt. 1, *EEOC v. Brik Enters., Inc.*, No. 2:24-cv-12817-BRM-CI (E.D. Mich. Oct. 25, 2024).

him.[50] On February 24, 2025, the EEOC moved to dismiss the case with prejudice, citing the change in policy announced in Executive Order 14168.[51]

74.     The EEOC has not asserted that any factual, legal, procedural, or other development relevant to any of these cases, or the strength or weakness of any of the underlying claims, caused the agency to seek dismissal with prejudice in these matters.

75.     The only material fact that has changed between when these lawsuits were filed and when the EEOC moved to dismiss them with prejudice was the EEOC's decision to stop fully enforcing Title VII with respect to transgender charging parties and claims of discrimination tied to gender identity or transgender status.

76.     Beyond seeking dismissal of the lawsuits described above, the Lucas-led EEOC has taken a number of iterative measures to foreclose transgender workers from fully participating in EEOC's charge-investigation process and availing themselves of Title VII's protections against discrimination.

77.     On January 30, 2025, it was reported that the EEOC had ceased processing charges related to sexual-orientation and gender-identity discrimination, including harassment.[52] Current and former EEOC staffers disclosed that the EEOC directive "prevents staff from making telephone calls, conducting research, or otherwise investigating both new and existing complaints."[53] One EEOC employee shared that, "when [the] employee looked at the backend of

---

[50] *Id.* at 8-11.
[51] Mot. to Dismiss EEOC's Litigation, Dkt. 26, *Brik Enters.* (E.D. Wis. Feb. 24, 2025).
[52] *See* Ryan Golden & Kate Tornone, *EEOC Tells Its Workers to Halt LGBTQ+ Discrimination Claim Processing*, HR Dive (updated Jan. 31, 2025), https://tinyurl.com/mrys4h56; Abby Vesoulis, *Government Commission Halts Investigations of LGBTQ+ Workplace Discrimination*, Mother Jones (Feb. 6, 2025), https://tinyurl.com/27r6tsfm.
[53] Vesoulis, *Government Commission Halts Investigations*, *supra* note 52.

the system this week, the status of all Title VII cases involving sexual orientation or gender identity (SOGI) had a new tag: "SOGI PAUSED."[54]

78.    On February 22, it was reported that a supervisor in the EEOC's New York District Office had instructed several EEOC administrative law judges ("ALJs") to prepare a list of all cases before them involving discrimination on the basis of sexual orientation or gender identity.[55] The email that the ALJs received "said no orders could be issued in those cases without first being reviewed by headquarters."[56]

79.    On April 18, it was further reported that the EEOC held an internal meeting two days prior, on April 16, at which EEOC intake supervisors were directed to designate all incoming charges of discrimination involving gender-identity discrimination as "C" charges—i.e., charges that the EEOC has determined are meritless and suitable for dismissal.[57]

80.    On July 10, 2025, it was reported that on July 1, Thomas Colclough, Director of the EEOC's Office of Field Programs, sent an email to EEOC staff announcing that the EEOC would resume accepting some—but not all—charges of discrimination filed by transgender workers.[58]

81.    According to the reporting, as of Colclough's July 1 directive, the EEOC has resumed processing charges of gender-identity discrimination that it believes "fall squarely" under *Bostock*—in the EEOC's view, only hiring, firing, and promotion cases.[59]

---

[54] *Id.*
[55] Nicholas Nehamas et al., *How Federal Employees Are Fighting Back Against Elon Musk*, N.Y. Times (Feb. 22, 2025), https://tinyurl.com/cxwb23yx.
[56] *Id.*; *see also* Claire Savage, *Meet the Federal Worker Who Went Rogue: 'I Hope That It Lights a Fire Under People,'* AP (Mar. 10, 2025), https://tinyurl.com/22tvchww.
[57] Claire Savage, *EEOC Instructs Staff to Sideline All New Transgender Discrimination Cases, Employees Say*, AP (Apr. 18, 2025), https://tinyurl.com/3kt27u9d.
[58] Julian Mark, *EEOC to Consider Some Transgender Discrimination Cases After Months-Long Pause*, Wash. Post. (July 10, 2025), https://tinyurl.com/stw94fuf.
[59] *Id.*

82.    But the EEOC has not resumed processing charges alleging other kinds of gender-identity discrimination, including harassment or retaliation faced by transgender workers.[60]

83.    On information and belief, the EEOC has not resumed processing even hiring, firing, or promotion charges when those charges are brought alongside excluded charges, such as harassment or retaliation.

84.    Moreover, all charges alleging gender-identity discrimination, including those alleging discrimination in hiring, firing, or promotion, will be "subject to a heightened level of review," meaning review by both a senior attorney and by the office of Acting Chair Lucas—a practice not required for other Title VII charges.[61]

85.    The Commission has also sought to restrain state and local civil-rights agencies from processing charges filed by transgender workers.

86.    On May 28, it was reported that Director Colclough sent a memorandum to FEPA directors on May 20 informing them that—effective retroactively from January 20, 2025—the EEOC would not be reimbursing FEPAs for conducting intakes of or undertaking the charge-investigation process with respect to charges related to "gender identity" or "transgender status."[62]

87.    The memorandum states that the EEOC would not be "granting credit for intakes or charge resolutions" implicated by Executive Order 14168.[63]

88.    The memorandum further provided, in relevant part, that to "ensure that such charges are appropriately handled for purposes of credit," all such charges will be "subject to substantial weight review."[64]

---

[60] *Id.*
[61] *Id.*
[62] *See* Rebecca Klar, *EEOC Cuts Funding to States' Workplace Transgender Bias Probes*, Bloomberg (May 28, 2025), https://tinyurl.com/eepba54r.
[63] *Id.*
[64] *Id.*

89.     A "substantial weight review" is the review the EEOC undertakes with respect to certain final determinations made by FEPAs to evaluate whether the FEPA gave due weight to the evidence and followed appropriate procedures before paying the FEPA for processing the charge.[65]

90.     On information and belief, before this memorandum was issued, the EEOC did not subject all FEPA charges related to gender identity or transgender status to substantial-weight review.

91.     In other words, the EEOC has ceased paying state and local agencies to accept and process charges of discrimination that assert unlawful discrimination based on a claimant's gender identity or transgender status.

92.     On information and belief, Director Colclough's July 1 email to EEOC staff about the EEOC's own processing of gender-identity charges did not lift or alter the May 20 memorandum to FEPAs.

**The EEOC's Trans Exclusion Policy**

93.     From at least 2011 onward, the EEOC enforced Title VII's protections against sex discrimination to include discrimination based on gender identity. Accordingly, charges of discrimination filed with the EEOC or a FEPA alleging discrimination based on gender identity or transgender status were processed as discrimination based on sex.

94.     Interpreting Title VII in a manner that contradicts years of its own legal analysis, Commission guidance and documents, and Supreme Court precedent, in the absence of a quorum, and without public comment, the EEOC has changed course.

95.     As the foregoing allegations show, the EEOC has established a new policy with

---

[65] *See* 29 C.F.R. § 1601.76. It is not clear why the memorandum would specify that a substantial-weight review would be required of gender-identity claims processed by FEPAs when it simultaneously announced that the EEOC would not reimburse FEPAs for processing such claims in the first instance.

respect to transgender charging parties and charges of sex discrimination tied to gender identity or transgender status.[66]

96.     Under the EEOC's Trans Exclusion Policy, transgender workers receive fewer protections than cisgender workers. When transgender workers file a charge of discrimination with the EEOC, they do not receive the same protections and benefits accorded cisgender charging parties.

97.     Where cisgender workers receive protections against sex discrimination, harassment, retaliation, and all other forms of discrimination covered by Title VII, transgender workers receive only protections against discrimination in the context of hiring, firing, and promotions—and, on information and belief, only then when those claims are brought in isolation, without accompanying harassment or retaliation claims. As its earlier dismissals with prejudice suggest, and on information and belief, the EEOC will not pursue legal action—and refuses to prosecute existing claims—if the charging party is transgender, regardless of whether the underlying claims depend on discrimination tied to gender identity or transgender status.

98.     The EEOC has foreclosed transgender workers from the full set of charge-investigation and other enforcement protections available to cisgender charging parties and categorically refuses to fully enforce the laws protecting against workplace sex discrimination tied to gender identity, in violation of Title VII and the Supreme Court's holding in *Bostock*.

**The Trans Exclusion Policy is harming Plaintiff FreeState Justice and its clients.**

99.     As described above, Plaintiff FreeState Justice serves Maryland's LGBTQ+ population through the provision of free legal services, legislative advocacy, and education and

---

[66] All people who are not cisgender who bring sex-discrimination claims tied to gender identity, including transgender, nonbinary, and gender-nonconforming people, are facing unlawful discrimination by the EEOC as a result of its nonenforcement policy.

outreach programming. Its mission is to ensure that LGBTQ+ people are free to live authentically, with safety, dignity, and respect in all communities throughout Maryland.

100.    To that end, one of FreeState's core services is helping clients who have experienced discrimination in employment, housing, or healthcare file discrimination charges to address and remedy that discrimination. It also helps clients with legal name changes, judicial declarations of gender identity, estate planning, and family-law matters.

101.    Before the EEOC's Trans Exclusion Policy came into effect, FreeState typically advised clients wishing to file employment-discrimination charges to file with the EEOC rather than the Maryland Commission on Civil Rights ("MCCR"), the state FEPA. In FreeState's experience, the EEOC provides charging parties with more information and engages in more resolutions of matters than MCCR.

102.    FreeState would help clients initiate the charge-investigation process at the EEOC and, in many cases, help its clients navigate the subsequent stages of the process. FreeState would, for example, review documents and position statements that the EEOC obtained from employers and produced to FreeState and its clients, as EEOC regulations require. These documents include employer policies, handbooks, emails, performance improvement plans, determinations, and other internal documents. Relying on the information obtained by the EEOC during its investigation, FreeState would also draft responses to employer position statements; prepare its clients for and join calls with the assigned EEOC investigator; join mediations or settlement negotiations and advise clients about the terms of settlement offers; and provide guidance about the costs and benefits of litigation.

103.    For matters that did not settle, FreeState would seek pro bono legal assistance for clients who wished to file a lawsuit.

104.    The EEOC's charge-investigation process facilitated the search for pro bono counsel because it typically armed FreeState and its clients with useful information that could inform prospective counsel about the strength of the claims, the need for further investigation, and the availability of damages or other remedies through litigation. FreeState's ability to procure this information was often critical to obtaining justice for its clients because FreeState has a small legal staff—just two staff attorneys, two part-time intake specialists, and a legal director—and does not have the resources to litigate cases in court.

105.    Since the Trans Exclusion Policy took effect, FreeState has had to advise its transgender clients to file charges of discrimination with MCCR rather than the EEOC.

106.    But MCCR's charge-investigation process is not an equal substitute for the EEOC's.

107.    As an initial matter, it is not even clear whether MCCR will continue to accept charges of discrimination based on gender identity under Title VII, or for how much longer it will continue to do so, because the EEOC has alerted FEPAs like MCCR that it will not reimburse them for charge intakes concerning allegations related to gender identity.

108.    Moreover, while the EEOC's sole focus is employment discrimination, MCCR's task is much broader. MCCR investigates discrimination in employment, housing, public accommodations, health services, and leasing of commercial property, among other areas. Its staff and budget must be shared across those issues. MCCR was not designed to shoulder all workplace-discrimination charges in the State. As a result, in FreeState's experience, the MCCR charge-filing process tends to take longer than the EEOC's, and the investigation process tends not to yield the same results as does the EEOC process.

109.    For example, in some cases, clients simply receive a right-to-sue letter from MCCR without ever talking to an investigator.

110.    In FreeState's experience, employers are also generally more likely to participate in an investigation brought by the EEOC than by MCCR.

111.    Critically, even if MCCR contacts the employer during an investigation, it does not always share the information it obtains with the charging party or their counsel, because Maryland law generally prohibits charging parties from obtaining employers' position statements.[67] Thus, unlike in the EEOC charge-investigation process, FreeState is unlikely to obtain employers' position statements or documentation that the employer believes supports its position.

112.    MCCR also does not facilitate mediation and settlement as readily as the EEOC does. About a quarter of FreeState's clients who file charges with the EEOC are able to reach a settlement with their employer. By contrast, few if any of FreeState's clients who have filed charges with MCCR have been able to settle with their employer.

113.    And because the MCCR process tends to yield little or no information from employers, it is more difficult for FreeState to help its clients obtain pro bono representation.

114.    The EEOC's Trans Exclusion Policy deprives FreeState and its clients of the benefits of the EEOC's charge-investigation process and the rest of the enforcement process—not just a perfunctory precursor to filing a lawsuit, but an important means of addressing unlawful discrimination in its own right that could lead to not only relief for individual clients, but also policy changes and improvements for an entire workplace, set of employers, industry, or region.

115.    Accordingly, the policy curtails FreeState's ability to redress workplace discrimination suffered by its transgender clients, impeding its ability carry out a core service in

---

[67] *See A.C. v. Off. of the Att'y Gen.*, No. 791, 2018 WL 878989, at *5 (Md. Ct. Spec. App. Feb. 13, 2018) (charging party was not legally entitled to her employer's position statement to MCCR).

fulfillment of its mission.

116.    The EEOC's Trans Exclusion Policy injures FreeState and its clients in several additional, related ways.

117.    The Trans Exclusion Policy injures FreeState and its clients by depriving them of information that they would be entitled to receive from the EEOC, including employer position statements and supporting documentation during the charge investigation process. As described above, losing access to that information impairs FreeState's ability to formulate an informed response to the employer's assertions and present the strongest case possible to the EEOC and to the employer, which in turn affects the likelihood of settlement. FreeState also relies on this information to persuade law firms to take on its clients' cases pro bono.

118.    Because, on information and belief, under the EEOC's Trans Exclusion Policy "mixed" charges—charges like race discrimination coupled with excluded charges like harassment tied to gender identity—are also excluded from processing, FreeState and its clients also stand to be harmed by having to file multiple charges of discrimination separately, i.e., one at MCCR involving gender-identity claims and one at the EEOC involving other kinds of claims.

119.    Filing with multiple agencies may become not just a practical necessity as a result of the Trans Exclusion Policy, but a requirement in order to properly exhaust claims under federal, state, and local law.

120.    Such splintering requires additional time and resources; it is more difficult to maintain multiple separate investigations moving along different tracks; the charges may be less compelling as separate sets of allegations than they would be as a single, complete story of discrimination; employers are less likely to respond to multiple investigations; and multiple open investigations may disincentivize an employer from attempting to settle a case.

121.    Because the  EEOC has implemented the Trans Exclusion Policy without public announcement, explanation, or detail, it has made it difficult if not impossible for FreeState to provide comprehensive, informed guidance to its clients and other members of the LGBTQ+ community about whether to file a charge of discrimination or where to file it.

122.     Moreover, because the Trans Exclusion Policy sends transgender workers the message that their charge of discrimination will not be taken seriously, or that it will not be accepted at all, it disincentivizes them from participating in the process. Indeed, a number of potential clients are deciding not to use FreeState Justice's legal services to file a charge, further impairing FreeState's ability to help its transgender clients redress employment discrimination.

123.    The policy will also discourage employers from crafting strong protections against gender-identity discrimination. Employers have little incentive to do so if they know their transgender employees have little recourse to vindicate their rights through the EEOC or FEPAs.

124.    Consequently, FreeState's clients who are experiencing pervasive workplace harassment and expect little to be done about it face difficult choices about whether to leave their job or leave the workforce altogether. Some may limit their engagement with work to the extent possible, or otherwise withdraw from the social fabric of their work environment. Still others may dress and present in a manner inconsistent with their gender identity or otherwise remain in the closet rather than risk harassment or other adverse consequences.

125.    All this harms FreeState's transgender clients and impairs FreeState's mission to ensure that LGBTQ+ people are free to live authentically, with safety, dignity, and respect.

126.    Finally, having to refrain from filing charges with the EEOC will also disrupt the important recordkeeping function that the charges serve, further harming FreeState's ability to carry out its mission. The filing of a charge creates a record of discrimination allegations against

a given employer, which allows government agencies to more swiftly identify and remediate workplaces where illegal discrimination is especially pervasive or has gone unchecked. The aggregate data alerts government and other actors to the severity of ongoing discrimination directed at transgender people, and thus serves as a barometer of whether and how to allocate resources to remediate the problem.

127.    FreeState is forced to expend resources to compensate for the harm to its mission that the Trans Exclusion Policy causes.

128.    Because, as described above, few details of the Trans Exclusion Policy have been made public and the policy has purportedly shifted over time, FreeState must expend additional resources to stay up-to-date on the state of the law and other information that workers need to make informed decisions about whether and how to file a charge of discrimination.

129.    FreeState has also had to expend resources on alternative non-legal but labor-intensive services for transgender people who are experiencing workplace discrimination—reviewing resumes and helping with the job search and application process—so that people experiencing workplace harassment can secure alternate employment even if they cannot obtain and redress from their current employer.

130.    In one instance, FreeState's resource team has even recently assisted a client in settling a case of employment discrimination directly with the employer, bypassing the EEOC or MCCR charge-investigation process altogether. That strategy, too, requires expending additional resources.

131.    FreeState's mission is to foster an environment in which LGBTQ+ Marylanders can thrive. Employment—including freedom from all forms of unlawful discrimination in the workplace—is a linchpin of that mission. Depriving LGBTQ+ people of access to equal, non-

discriminatory employment protections can have devastating consequences. It can deprive them of access to healthcare and the means to access housing, education, and more, and threaten long-term instability, including for their families and communities.

132.    The policy impedes FreeState's ability to carry out its mission to safeguard the rights and interests of LGBTQ+ Marylanders—starting with their right to employment free of discrimination. It is forcing FreeState to expend resources on outreach, education, and non-legal assistance to attempt to counteract the attendant harms.

133.    If the Trans Exclusion Policy were lifted, FreeState Justice would immediately resume advising clients to file, and itself filing, charges of discrimination based on gender identity with the EEOC.

## CLAIMS FOR RELIEF

### Count I

### *Ultra Vires* Action—Violation of Title VII of the Civil Rights Act of 1964

134.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

135.    Title VII of the Civil Rights Act of 1964 requires that, upon the filing of a charge of discrimination, the EEOC must, among other things, (1) serve notice of the charge on the employer, (2) investigate the charge to determine whether there is reasonable cause to believe that the charge is true, and (3) when it has reasonable cause to believe that the charge is true, endeavor to eliminate any unlawful employment practices by informal methods of conference, conciliation, and persuasion. 42 U.S.C. § 2000e-5(b).

136.    Title VII requires that the Commission have a quorum of three members to exercise its powers. 42 U.S.C. § 2000e-4(c).

137.    The Commission has, in the absence of a quorum, ceased fully fulfilling its Title VII charge-investigation obligations with respect to charges brought by transgender individuals.

138.    The Commission has ceased carrying out its Title VII charge-investigation and other enforcement obligations with respect to some categories of charges tied to gender-identity discrimination, including harassment charges; retaliation charges; and even hiring, firing, or promotion charges when they are brought alongside charges alleging harassment, retaliation, or other excluded claims.

139.    Title VII does not authorize the Commission to selectively exclude categories of charging parties or kinds of discrimination from the charge-investigation process, or to act without a quorum.

140.    The EEOC's actions are contrary to Title VII's requirement that the Commission investigate all charges of discrimination.

141.    By refusing to process certain charges of sex discrimination brought by transgender charging parties, Defendants are engaging in *ultra vires* action in violation of Title VII.

## Count II

### Violation of the Fifth Amendment of the U.S. Constitution—Equal Protection

142.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

143.    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." The Supreme Court has held that the Due Process Clause includes a guarantee against the United States of equal protection of the laws equivalent to that guaranteed against the States by the Equal Protection Clause of the Fourteenth Amendment.

144.    The government may not deny its services to one disfavored group without running afoul of the Equal Protection Clause. The EEOC has done so here.

145.    Under the Trans Exclusion Policy, transgender workers, including FreeState's clients, receive fewer protections than cisgender workers. When transgender workers seek the

protections and benefits of the EEOC's charge-filing process, they receive a fraction of the protections and benefits accorded cisgender claimants.

146.    Whereas cisgender workers receive protections against harassment, retaliation, and all forms of discrimination covered by Title VII, transgender workers receive—at most—only protections against sex discrimination in the context of hiring, firing, and promotions and only when transgender workers assert a standalone claim of hiring, firing, or promotion-related discrimination. The EEOC has categorically ceased processing charges of discrimination brought by transgender individuals alleging other categories of sex discrimination, including claims of harassment and retaliation.

147.    The EEOC continues to process all charges of discrimination, including harassment and retaliation, brought by cisgender individuals. The EEOC does not automatically classify such charges as meritless on their face.

148.    The EEOC has also ceased bringing and litigating cases in federal court on behalf of transgender workers, including but not limited to cases involving claims of discrimination based on gender identity, as highlighted in the EEOC's litigation dismissals.

149.    The EEOC continues to litigate claims of discrimination brought by cisgender individuals.

150.    The EEOC announced FEPAs will not be reimbursed for their acceptance and processing of charges of discrimination asserting unlawful sex discrimination when the allegations are tied to gender identity.

151.    The EEOC has not ceased reimbursing FEPAs for processing charges of discrimination asserting unlawful discrimination based on other forms of sex discrimination.

152.    Transgender workers, including FreeState's clients, are thus deprived the full benefits of the charge-investigation and other enforcement processes, including the opportunity to gather information, obtain monetary relief, reinstatement, or policy change through mediation or settlement, or even the opportunity for their rights to be vindicated through EEOC-led litigation.

153.    The EEOC's Trans Exclusion Policy targets transgender people for disfavored treatment and discriminates against them, without lawful justification, in violation of the equal protection component of the Due Process Clause of the Fifth Amendment.

154.    Categorically refusing to process certain charges of discrimination brought by or on behalf of transgender workers alleging sex-based discrimination including harassment or retaliation, while processing all charges of discrimination brought by or on behalf of cisgender workers alleging sex-based discrimination, is a sex-based classification.

155.    Such a classification based on sex is presumptively unconstitutional.

156.    Such a classification based on transgender status is presumptively unconstitutional.

157.    Defendants lack even a rational basis for these classifications, much less could they show that the classifications are substantially related to an important government interest.

158.    Indeed, Executive Order 14168, Acting Chair Lucas's press release, and the Commission's other actions—including its seeking to dismiss with prejudice cases it had been litigating in federal court on behalf of transgender workers, regardless of whether the cases involved gender-identity claims—show that the Commission's Trans Exclusion Policy was motivated only by animus against transgender people.

159.    Defendants cannot show that the Trans Exclusion Policy and the sex-based classification that it draws rationally advances any legitimate government interest, much less that it is substantially related to an important government interest.

160.    The classification lacks adequate tailoring under any standard of review.

**Count III**

**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)
Arbitrary and capricious**

161.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

162.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

163.    The EEOC's Trans Exclusion Policy is reviewable final agency action because it (1) "marks the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation modified).

164.    The Trans Exclusion Policy marks the consummation of the EEOC's decision-making process because the EEOC has given notice as to how it interprets its obligations with respect to processing charges of discrimination involving gender-identity claims and because it is already implementing the policy.

165.    Indeed, the EEOC has already ceased processing such charges; it has already moved to dismiss cases involving claims by transgender workers; and it has already stopped funding state and local FEPAs to carry out that work.

166.    The Trans Exclusion Policy is an action by which both Plaintiff's and Defendants' rights or obligations are determined, and from which legal consequences flow. It deprives Plaintiff of a channel through which to vindicate its clients' interests. And it marks the EEOC's own legal determination that it need not—and that its field officers and FEPA contractors cannot—fully

enforce Title VII's protections against sex discrimination with respect to transgender charging parties.

167.    The Trans Exclusion Policy is arbitrary and capricious.

168.    An agency cannot depart from prior policies without acknowledging that it is making such a change and explaining its reasoning for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies must "examine the relevant data and articulate a satisfactory explanation" when altering or rescinding their rules. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Fox*, 556 U.S. at 515. And they must specifically consider the reliance interests of those who may be impacted by a change in their policies. *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30-31 (2020).

169.    The Trans Exclusion Policy, at every iteration, departs without sufficient explanation from the EEOC's federal-sector adjudications, as well as from its Anti-Harassment Guidance and its SEP, both of which were approved and went into effect following a notice-and-comment period and majority vote of the Commissioners.

170.    The Trans Exclusion Policy fails to consider or explain the implications for existing reliance interests.

171.    The Trans Exclusion Policy fails to account for other legal requirements that may be implicated by the changes it implements, including the EEOC's obligations under Title VII to investigate and process all charges of discrimination, Title VII's protection against discrimination on the basis of gender identity, as recognized by the Supreme Court in *Bostock*, and the equal-protection considerations when one protected class is excluded from certain agency protections.

172.    To the extent that Defendants attempt to explain their change in policy, they rely on Executive Order 14168.

173.    The EEOC's bare reliance on the policy and political preferences set out in Executive Order 14168 is insufficient to justify the Commission's departure from the plain text of Title VII, binding Supreme Court precedent, and the EEOC's own internal guidance and procedures.

## Count IV

### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A), (C)
### Contrary to law and in excess of statutory limitation

174.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

175.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

176.    As set forth above, the Trans Exclusion Policy constitutes reviewable final agency action under the APA.

177.    As set forth above, in the absence of a quorum, under the Trans Exclusion Policy, the EEOC has ceased fully fulfilling its charge-investigation obligations for charges brought by transgender workers and charges tied to gender-identity discrimination, in violation of Title VII.

178.    The Trans Exclusion Policy is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations" under the APA, 5 U.S.C. § 706(2)(A), (C).

## Count V

### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(B)
### Contrary to constitutional right

179.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

180.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right." 5 U.S.C. § 706(2)(B).

181.    As set forth above, under the Trans Exclusion Policy, transgender workers, including FreeState's clients, are deprived the full benefits and protections of the EEOC's charge-investigation and related processes that cisgender charging parties receive.  Such a classification based on sex and transgender status is presumptively unconstitutional under the Equal Protection Clause.

182.    As set forth above, the EEOC's Trans Exclusion Policy targets transgender people for disfavored treatment and discriminates against them.

183.    As set forth above, Defendants lack even a rational basis for these classifications, much less could they show that the classifications are substantially related to an important government interest.

184.    The Trans Exclusion Policy violates the Fifth Amendment and is therefore contrary to constitutional right under the APA.

### Count VI

### Violation of the Administrative Procedure Act— 5 U.S.C. § 706(2)(D)
### Without observance of procedure required by law

185.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

186.    Under the APA, a court must "hold unlawful and set aside agency action" undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

187.    Agencies cannot issue substantive rules without following the notice-and-comment rulemaking procedures set out in the APA. *See* 5 U.S.C. § 553. Nor can they amend previously issued substantive rules without following those procedures.

188.    The Trans Exclusion Policy is a "rule" within the meaning of the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

189.    The Trans Exclusion Policy is not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice." 5 U.S.C. § 553(b). Rather, it is a substantive rule, because it "supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Casa De Maryland v. Dep't of Homeland Security*, 924 F.3d 684, 702 (4th Cir. 2019) (citation omitted).

190.    The Trans Exclusion Policy categorically dictates which classes of charging parties and claims are entitled to the full benefits and protections of the charge-investigation process required under Title VII, and which are not. It sets out a rule that transgender charging parties are excluded from fully participating in the statutorily required charge-investigation process.

191.    Defendants promulgated the Trans Exclusion Policy without notice and comment, in the absence of a quorum, and without a majority vote by the Commissioners.

192.    Defendants have acted without observance of procedure required by law.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

a.    Declare that Defendants' Trans Exclusion Policy is unlawful and unconstitutional under Title VII of the Civil Rights Act of 1964, the Fifth Amendment of the U.S. Constitution, and the APA;

b.    Vacate and set aside Defendants' Trans Exclusion Policy under the APA;

c.    Permanently enjoin Defendants from implementing the Trans Exclusion Policy, including from denying transgender workers the full set of Title VII-mandated charge-investigation and other enforcement processes and protections that all other charging parties enjoy; categorically declining to prosecute new or ongoing litigation involving transgender workers; and refusing to reimburse FEPAs for charges related to discrimination tied to gender identity or transgender status;

d.    Award Plaintiff its costs, reasonable attorney's fees, and other disbursements as appropriate; and

e.    Grant such other relief as the Court deems necessary, just, and proper.

Dated: July 29, 2025                           Respectfully submitted,


                                               /s/ Sarah R. Goetz

Lauren Khouri (Bar No. 19549)                  Sarah Goetz (Bar No. 31570)
Rachel Smith*                                  Audrey Wiggins (Bar No. 31620)
Elizabeth Theran*                              Sunu Chandy (Bar No. 31569)
Gaylynn Burroughs*                             DEMOCRACY FORWARD FOUNDATION
NATIONAL WOMEN'S LAW                           P.O. Box 34553
CENTER                                         Washington, DC 20043
1450 I Street NW, Suite 700                    Phone: (202) 448-9090
Washington, DC 20005                           Fax: (202) 796-4426
Phone: (202) 571-8735                          sgoetz@democracyforward.org
Fax: (202) 588-5185                            awiggins@democracyforward.org
lkhouri@nwlc.org                               schandy@democracyforward.org
rsmith@nwlc.org
etheran@nwlc.org
gburroughs@nwlc.org

*Pro hac vice application
forthcoming

                    Counsel for Plaintiff