**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| FREESTATE JUSTICE, | |
| Plaintiff, | |
| v. | No. 1:25-cv-02482-GLR |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION and ANDREA LUCAS, in her official capacity as CHAIR of the EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 2

    I.     Legal Background ...................................................................................... 2

          A.     Statutes and Regulations ................................................................ 2

          B.     Charge Intake Process ................................................................... 3

    II.    Factual and Procedural Background ........................................................ 4

LEGAL STANDARD ........................................................................................... 6

ARGUMENT ........................................................................................................ 7

    I.     The Court Should Dismiss For Lack Of Jurisdiction ............................... 7

          A.     FreeState Lacks Standing For All Claims ...................................... 7

               1.     FreeState Lacks Standing To Challenge How
                      The Commission Exercises Enforcement Discretion. ................... 8

               2.     FreeState Has Not Asserted A Cognizable Injury. ....................... 10

               3.     FreeState's Asserted Injuries Are Not Redressable. .................... 17

          B.     The APA Precludes Jurisdiction Over FreeState's APA Claims ............. 18

               1.     FreeState Does Not Challenge A Discrete,
                      Final Agency Action. .................................................................... 19

                2.     There Is An Adequate Alternative Remedy In A Court. ............. 22

                3.     EEOC's Enforcement Decisions Are Committed To Agency
                      Discretion By Law. ...................................................................... 23

    II.    FreeState's Procedural Challenges Fail On Other Grounds. ................... 28

CONCLUSION ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Gov't Emps v. Off. of Special Counsel,*
  1 F.4th 180 (4th Cir. 2021) ........................................................................................ 28

*Am. First Leg. Found. v. Greer,*
  — F.4th —, 2025 WL 2810813 (D.C. Cir. Oct. 3, 2025) ........................................ 18

*Ancient Coin Collectors Guild v. CBP,*
  698 F.3d 171 (4th Cir. 2012) ...................................................................................... 29

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ...................................................................................... 24

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................................... 7

*Balt. Gas and Elec. Co. v. FERC,*
  252 F.3d 456 (D.C. Cir. 2001) .................................................................................... 26

*Bell Atl. Cash Balance Plan v. EEOC,*
  1999 WL 485679 (4th Cir. July 12, 1999) ................................................................ 20

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................................................... 7

*Bennett v. Spear,*
  520 U.S. 154 (1997) .................................................................................................... 20

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) .................................................................................................... 22

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ........................................................................................................ 10

*Buscemi v. Bell,*
  964 F.3d 252 (4th Cir. 2020) ...................................................................................... 17

*Casa de Md. v. Dep't of Homeland Security,*
  924 F.3d 684 (4th Cir. 2019) ...................................................................................... 30

*Casa de Md., Inc. v. Wolf,*
  486 F. Supp. 3d 928 (D. Md. 2020) .......................................................................... 14

*Chandler v. Roudebush,*
    425 U.S. 840 (1976) ........................................................................................ 22

*Citizens for Responsibility and Ethics in Washington v. Fed. Elec. Comm'n,*
    993 F.3d 880 (D.C. Cir. 2021) ................................................................. 25, 27

*City of New York v. U.S. Dep't of Def.,*
    913 F.3d 423 (4th Cir. 2019) .................................................................. 19, 20

*Cmty. for Creative Non-Violence v. Pierce,*
    786 F.2d 1199 (D.C. Cir. 1986) .............................................................. 17, 27

*Cobell v. Kempthorne,*
    455 F.3d 301 (D.C. Cir. 2006) ........................................................................ 19

*Ctr. for L. & Educ. v. Dep't of Educ.,*
    396 F.3d 1152 (D.C. Cir. 2005) ...................................................................... 11

*De Martinez v. Lamagno,*
    515 U.S. 417 (1995) ........................................................................................ 27

*Dreher v. Experian Info. Sols., Inc.,*
    856 F.3d 337 (4th Cir. 2017) .......................................................................... 13

*EEOC v. Sterling Jewelers, Inc.,*
    801 F.3d 96 (2d Cir. 2015) ............................................................................. 27

*EEOC v. Waffle House, Inc.,*
    534 U.S. 279 (2002) ................................................................................. 12, 24

*Env't Working Grp. v. FDA,*
    301 F. Supp. 3d 165 (D.D.C. 2018) ............................................................... 14

*EPA v. Brown,*
    431 U.S. 99 (1977) .......................................................................................... 20

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ........................................................................................ 14

*Fla. Audubon Soc'y v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996) .......................................................................... 12

*Fort Bend Cnty. v. Davis,*
    587 U.S. 541 (2019) .......................................................................................... 3

*Freeman v. Beverly,*
    2020 WL 2747392 (D. Md. May 27, 2020) ................................................... 22

*Fresno Cmty. Hosp. and Med. Ctr. v. Cochran*,
    987 F.3d 158 (D.C. Cir. 2021) ............................................................................. 29

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) ............................................................................. 22

*Gen. Tel. Co. of Nw., Inc. v. EEOC*,
    446 U.S. 318 (1980) ............................................................................................. 12

*Georator Corp. v. EEOC*,
    592 F.2d 765 (4th Cir. 1979) ......................................................................... 20, 21

*George Banat Co., Inc. v. NLRB*,
    626 F.2d 354 (4th Cir. 1980) ............................................................................... 10

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ....................................................................... 9, 23, 24, 25, 26

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ............................................................................................. 16

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ............................................................................................. 10

*ICC v. Locomotive Eng'rs*,
    482 U.S. 270 (1987) ............................................................................................. 10

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ............................................................................................... 7

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ....................................................................................... 16, 17

*Lance v. Coffman*,
    549 U.S.  (2007) ................................................................................................. 16

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) ............................................................................... 14

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ....................................................................................... 23, 24

*Lovo v. Miller*,
    107 F.4th 199 (4th Cir. 2024) .............................................................................. 19

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................... 7, 12, 17

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................. 19

*Mach Mining, LLC v. EEOC*,
    575 U.S. 480 (2015) ........................................................... 26, 27

*Maryland v. USDA*,
    151 F. 4th 197 (4th Cir. 2025) ................................................ 18

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ................................................................. 3

*Md. Highways Contractors Ass'n v. State of Maryland*,
    933 F.2d 1246 (4th Cir. 1991) ................................................ 11

*Mississippi v. Johnson*,
    71 U.S. 475 (1866) ................................................................. 18

*Nat'l Ass'n of Consumer Advocs. v. Gemini Tr. Co., LLC*,
    757 F. Supp. 3d 59 (D.D.C. 2024) .......................................... 11

*Nat'l Fair. Hous. All. v. Bank of Am., N.A.*,
    2025 WL 2030225 (D. Md. July 21, 2025) ............................. 15

*Nat'l Min. Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ................................................ 30

*Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*,
    990 F.3d 834 (4th Cir. 2021) .................................................. 18

*Nielsen v. Hagel*,
    666 F. App'x 225 (4th Cir. 2016) ..................................... 22, 23

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ................................................................. 19

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ................................................................. 30

*PETA, Inc. v. Tri-State Zoological Park of W. Md.*,
    843 F. App'x 493 (4th Cir. 2021) ........................................... 10

*Pinson v. U.S. Dep't of Just.*,
    514 F. Supp. 3d 232 (D.D.C. 2021) ........................................ 18

*Powers v. Ohio*,
    499 U.S. 400 (1991) ................................................................ 17

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
    120 F.4th 390 (4th Cir. 2024) ............................................................... 13, 14

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) ................................................................... 10

*Sierra Club v. Jackson*,
    648 F.3d 848 (D.C. Cir. 2011) .................................................................. 27

*Sierra Club v. Larson*,
    882 F.2d 128 (4th Cir. 1989) ............................................................... 24, 25

*Smith v. Casellas*,
    119 F.3d 33 (D.C. Cir. 1997) .................................................................... 23

*Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*,
    528 F.3d 310 (4th Cir. 2008) ................................................................... 24

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................................... 7, 16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .............................................................................. 13

*Swift v. United States*,
    318 F.3d 250 (D.C. Cir. 2003) .................................................................. 26

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ............................................................................... 7

*Terry v. Dir., Complaint Adjudication Div., U.S. EEOC, Off. of Fed. Operations*,
    21 F. Supp. 2d 566 (E.D. Va. 1998) .......................................................... 23

*Town of Castle Rock v. Gonzales*,
    545 U.S. 748 (2005) .............................................................................. 27

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ............................................................................... 8

*Trump v. United States*,
    603 U.S. 593 (2024) ............................................................................... 9

*U.S. Dep't of Lab. v. Triplett*,
    494 U.S. 715 (1990) .............................................................................. 16

*U.S. ex rel. Vuyyuru v. Jadhav*,
    555 F.3d 337 (4th Cir. 2009) .................................................................... 7

*United States v. Price,*
  111 F.4th 392 (4th Cir. 2024) ................................................................. 4

*United States v. Texas,*
  599 U.S. 670 (2023) ............................................................. 8, 9, 11, 27

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs,*
  714 F.3d 186 (4th Cir. 2013) ............................................................... 20

*Ward v. EEOC,*
  719 F.2d 311 (9th Cir. 1983) .......................................................... 21, 22

*Zak v. Chelsea Therapeutics Int'l, Ltd.,*
  780 F.3d 597 (4th Cir. 2015) ................................................................. 4

**Statutes**

5 U.S.C. § 551(4) ..................................................................................... 30

5 U.S.C. § 553(b) ..................................................................................... 29

5 U.S.C. § 701(a) ..................................................................................... 23

5 U.S.C. § 704 ............................................................................. 19, 20, 22

42 U.S.C. § 2000e-4(a) ............................................................................ 29

42 U.S.C. § 2000e-5(b) .................................................... 2, 3, 9, 12, 26, 27

42 U.S.C. § 2000e-5(e) .............................................................................. 2

42 U.S.C. § 2000e-5(f) ................................................... 3, 12, 22, 23, 28

42 U.S.C. § 2000e-8(b) .............................................................................. 6

Pub. L. No. 88-352, § 705, 78 Stat. 241, 258 (1964) ................................. 2

Pub. L. No. 92-261, § 4, 86 Stat. 103, 104–07 (1972) ............................... 2

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ................................................. 6

**Regulations**

29 C.F.R. § 1601.15(a) ......................................................................... 12, 13

29 C.F.R. § 1601.15(b) ............................................................................ 12

29 C.F.R. § 1601.18(c) ............................................................................................ 29

29 C.F.R. § 1601.19(a) ........................................................................................... 29

29 C.F.R. § 1601.20(a) ........................................................................................... 29

29 C.F.R. § 1601.21(d) ........................................................................................... 29

29 C.F.R. § 1601.28(e) ............................................................................................. 2

**Other Authorities**

EEOC, *Fair Employment Practices Agencies and Dual Filing*,
   https://www.eeoc.gov/fair-employment-practices-agencies-fepas-and-dual-filing ................. 6

EEOC, *Fiscal Year 2024 Annual Performance Report* (Jan. 17, 2025),
   https://www.eeoc.gov/sites/default/files/2025-01/24-
   126_EEOC_2024_APR_508_1.16.25_508.pdf ........................................................ 3, 4, 9, 28

EEOC, *FY 2020 Charge Report Submitted to Congress* (May 19, 2021),
   https://www.eeoc.gov/legislative-affairs/fy-2020-charge-report-submitted-congress ............... 4

EEOC, *How to File a Charge of Employment Discrimination*,
   https://www.eeoc.gov/how-file-charge-employment-discrimination ...................................... 3

EEOC Public Portal,
   https://publicportal.eeoc.gov/Portal/Login.aspx ......................................................... 3

FreeState Justice, *Training*,
   https://www.FreeState-justice.org/trainings ............................................................. 14

Gov't Accountability Off., GAO-23-106245, Equal Employment Opportunity Commission:
   Oversight of the Length of the Charge Intake Process Is Needed (2022),
   https://www.gao.gov/products/gao-23-106245 ........................................................... 3

## INTRODUCTION

In this case, a legal-services nonprofit called FreeState Justice (FreeState) broadly challenges how the Equal Employment Opportunity Commission and Chair Andrea Lucas (collectively, the Commission or EEOC) prioritize the enforcement of various federal antidiscrimination laws. Specifically, FreeState says that the Commission has adopted an unlawful policy not to investigate allegations of discrimination or "fully enforc[e]" certain kinds of discrimination claims brought by transgender individuals. ECF No. 1 (Compl.) ¶ 75. But in the same way that a citizen cannot challenge the decision of the FBI or a U.S. Attorney to focus on certain kinds of crimes over others, FreeState cannot challenge the EEOC's discretionary decisions about how to enforce federal antidiscrimination law.

When to investigate violations of federal law and when to enforce those laws are core Executive functions generally insulated from judicial review. Allowing FreeState's suit would thrust this Court into the role of an overseer that micromanages the Commission's enforcement process. The separation of powers does not countenance such a judicial role. Nor does Title VII of the Civil Rights Act (Title VII), which leaves to the Commission's discretion not only which discrimination cases to pursue but also how to categorize and process the tens of thousands of charges the agency receives each year. FreeState cannot step in where Congress has left such decisions in the Commission's ken. Nor can this Court.

The Complaint should be dismissed on this basis alone. The Supreme Court has squarely held that litigants lack standing to challenge an agency's enforcement priorities. There are other deficiencies too, including that FreeState's asserted injuries cannot confer standing and that the purported policy is neither a discrete action nor final as required by the Administrative Procedure Act (APA). At its heart, though, FreeState's suit threatens to create a new paradigm in which

1

courts may dictate when and how the Executive Branch can enforce federal laws. Such a suit is grossly improper, and the Complaint should be dismissed.

## BACKGROUND

### I.    Legal Background

#### A.  Statutes and Regulations

Congress created the Commission in Title VII of the Civil Rights Act of 1964 and endowed it with various authorities to enforce that law. *See* Pub. L. No. 88-352, § 705, 78 Stat. 241, 258 (1964). One such authority is to receive charges of discrimination from private employees. Congress also required that before any employee could sue its employer for employment discrimination, the employee must file a charge with the Commission. *See id.* § 706(e), 78 Stat. at 260. In 1972, Congress gave the Commission additional authority to sue, at its discretion, private employers in federal court for violations of Title VII if the Commission determined that a charge had merit. *See* Pub. L. No. 92-261, § 4, 86 Stat. 103, 104–07 (1972).

The process works like this. A person claiming to be aggrieved by an unlawful employment practice must timely file a charge of discrimination with the Commission, *see* 42 U.S.C. § 2000e-5(e)(1), and upon receipt of a charge, the Commission must serve a notice of the charge on the employer within ten days, *see id.* § 2000e-5(b). Title VII says that the Commission "shall make an investigation thereof" upon receipt of the charge but does not specify the details of that investigation. *Id.* If "after such investigation" the Commission determines that there is not reasonable cause to believe the charge is true, the Commission "shall dismiss the charge and promptly notify" the charging party and the employer. *Id.* Notification to the charging party comes in a "right-to-sue" notice. *See* 29 C.F.R. § 1601.28(e). Alternatively, if the Commission finds "reasonable cause" to believe the charge is true, the Commission must first use informal

conciliation means to eliminate the unlawful employment practice and, if those means fail, may sue the employer directly. *See* 42 U.S.C. § 2000e-5(b), (f)(1).

Whether or not the Commission acts on the charge, the charging party is entitled to a right-to-sue notice 180 days after the charge is filed. *See id.* § 2000e-5(f)(1). Within 90 days of receiving the notice, the charging party may commence a lawsuit against the employer. *See id.*; *see generally Fort Bend Cnty. v. Davis*, 587 U.S. 541, 544–45 (2019) (describing this process). Whether the charging party or EEOC sues, the subsequent trial reviews the discrimination allegations de novo. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 799 (1973).

### B. Charge Intake Process

The Commission typically receives tens of thousands of charges each year. In Fiscal Year 2024 alone, it received 88,531 new charges, representing an almost 10 percent increase from the previous fiscal year. *See* EEOC, *Fiscal Year 2024 Annual Performance Report* 12 (Jan. 17, 2025) (Annual Report).[1] To adjudicate this incoming volume, the Commission has established a charge intake system. Usually, an individual first submits an online inquiry through the EEOC's Public Portal. *See* EEOC Public Portal, https://publicportal.eeoc.gov/Portal/Login.aspx (last visited Oct. 15, 2025). "[I]ndividuals generally have an intake interview" with EEOC staff shortly thereafter. Gov't Accountability Off., GAO-23-106245, Equal Employment Opportunity Commission: Oversight of the Length of the Charge Intake Process Is Needed 12 n.20 (2022), https://www.gao.gov/products/gao-23-106245, *cited by* Compl. ¶ 40 n.4. As the Commission's website makes clear, the interview is "the best way to address" the charging party's concerns and "determine whether filing a charge of discrimination is the appropriate path." EEOC, *How to File*

---

[1]    Available    at    https://www.eeoc.gov/sites/default/files/2025-01/24-126_EEOC_2024_APR_508_1.16.25_508.pdf.

*a Charge of Employment Discrimination*, https://www.eeoc.gov/how-file-charge-employment-discrimination (last visited Oct. 15, 2025).

To focus resources appropriately, the Commission uses Priority Charge Handling Procedures to "categorize[] charges for priority handling based on the likelihood of an investigation resulting in a finding of reasonable cause." EEOC, *FY 2020 Charge Report Submitted to Congress* (May 19, 2021).[2] Under that system, the agency classifies charges into Categories A, B, and C. "Category A charges are those where it appears likely that discrimination has occurred." *Id.* "Category B charges are those [the Commission] need[s] to investigate further to determine whether there is a violation of the laws." *Id.* And "Category C charges are those that further investigation likely will not result in a finding of discrimination," including charges where the Commission "do[es] not have jurisdiction, the charges are self-defeating, or the allegations are not credible." *Id.* "Category C charges are dismissed quickly—often at intake—to free resources for investigators to focus on cases more likely to have merit." *Id.* Of the tens of thousands of submitted charges, only a few hundred result in lawsuits filed by the Commission. *See* Annual Report at 40 (EEOC had 205 merits cases on its docket at the end of FY 2024).

## II.     Factual and Procedural Background

On July 29, 2025, FreeState filed the Complaint. *See* Compl. FreeState describes itself as a "legal-services nonprofit organization serving [Maryland's] LGBTQ+ population" through "the provision of free legal services, legislative advocacy, and education and outreach programming." *Id.* ¶ 15. That work includes helping clients to file charges of employment discrimination.

---

[2]     Available at https://www.eeoc.gov/legislative-affairs/fy-2020-charge-report-submitted-congress. The Court may "consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015). The Court may take judicial notice of government reports like the EEOC report to Congress cited here. *See United States v. Price*, 111 F.4th 392, 407 n.9 (4th Cir. 2024).

FreeState says that it advises clients during the EEOC investigatory process, including through document review, drafting responses to employer submissions, and advising on settlement offers. *See id.* ¶ 102.  If a charge does not settle, FreeState seeks pro bono counsel for clients wishing to file a lawsuit.  *See id.* ¶ 103.

The Complaint alleges that after the Commission lost a quorum, Chair Lucas adopted a purported policy (referred to here as the Alleged Policy or Policy) to "deprive[] transgender workers of the full set of charge-investigation and other enforcement protections that the EEOC provides to other workers." *Id.* ¶ 12.  FreeState alleges that the Commission has taken three actions in furtherance of this Alleged Policy.  First, FreeStates says, the Commission moved to dismiss with prejudice seven lawsuits that it had brought alleging discrimination, harassment, or unlawful retaliation by "transgender or non-binary workers."  *Id.* ¶¶ 71–73.  Second, the Commission changed its charge-processing procedures for charges filed by transgender charging parties.  *Id.* ¶ 76.  The allegations are not entirely clear about the sequence of these changes, but FreeState alleges that the Commission now is "processing" only certain charges of gender-identity discrimination, namely "hiring, firing, and promotion" cases.  *Id.* ¶ 81.  "[C]harges alleging other kinds of gender-identity discrimination" or mixed claims alleging discrimination in standalone hirings, firings, and promotions alongside allegations of other gender-identity discrimination have been placed in Category C.  *Id.* ¶¶ 79, 83–84.

Third and finally, FreeState alleges that the Commission has informed Fair Employment Practices Agencies (FEPAs)—which are state and local agencies responsible for enforcing state and local employment-discrimination laws, *id.* ¶ 52—that the Commission will no longer pay them

for processing charges related to gender identity or transgender status and would subject such charges to a new "substantial weight review," *see id.* ¶¶ 86–88.[3]

FreeState alleges that the Alleged Policy harms FreeState "and its clients," *id.* ¶ 116, by forcing FreeState to advise its transgender clients to file charges with the Maryland Commission on Civil Rights (MCCR) rather than the EEOC, *see id.* ¶ 105.  FreeState also alleges that the Policy deprives it of information that is typically generated through the Commission's investigative process, such as employer position statements.  *See id.* ¶ 117.  Lastly, FreeState alleges that it has expended resources in direct response to the Alleged Policy.  *See id.* ¶¶ 127–30.

FreeState brings six claims, two alleging that the Policy is *ultra vires* and violates the Fifth Amendment, *see id.* ¶¶ 134–60, and four alleging that the Policy should be set aside under various provisions of the APA, *see id.* ¶¶ 161–92.  In its prayer for relief, FreeState requests, among other things, a permanent injunction enjoining the Commission from implementing the Alleged Policy.

The Court previously set a briefing schedule on the Commission's response to the Complaint and amended that schedule further after the government filed a motion to stay the case due to the lapse in appropriations.  *See* ECF Nos. 20, 23.  The Commission hereby moves to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  A court may look beyond the pleadings and view any competent proof submitted by the parties to determine if the plaintiff has established jurisdiction

---

[3] As authorized by Title VII, the Commission contracts with FEPAs to allow dual filing of charges alleging violations of both federal and state law.  *See* 42 U.S.C. § 2000e-8(b).  For those charges, the receiving agency (whether the Commission or a FEPA) files allegations with the other agency. *See* EEOC, *Fair Employment Practices Agencies and Dual Filing*, https://www.eeoc.gov/fair-employment-practices-agencies-fepas-and-dual-filing (last visited Oct. 15, 2025).

by a preponderance of the evidence.  *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009).  The burden of establishing the court's jurisdiction "rests upon" the plaintiff as "the party asserting jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court considers "the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## ARGUMENT

### I.    The Court Should Dismiss For Lack Of Jurisdiction.

The Court lacks jurisdiction over all of FreeState's claims because FreeState lacks standing to bring this suit.  The Court also lacks jurisdiction over FreeState's APA claims for APA-specific reasons.

#### A.  FreeState Lacks Standing For All Claims.

The party invoking federal jurisdiction bears the burden of establishing the "irreducible constitutional minimum of standing[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). A plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016).  To establish injury in fact, a plaintiff must show that it has suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560).

7

1. **FreeState Lacks Standing To Challenge How The Commission Exercises Enforcement Discretion.**

FreeState lacks standing at the threshold because suits that attempt to control the Executive's exercise of enforcement discretion "run up against the Executive's Article II authority to enforce federal law." *United States v. Texas*, 599 U.S. 670, 678 (2023). The gravamen of the Complaint challenges how the Commission "enforce[es] the Nation's federal workplace antidiscrimination laws." Compl. ¶ 1. Charitably read, the Complaint seeks an order directing how the Commission should enforce those laws through its categorization of incoming charges and its litigation activities. But a member of the public like FreeState "lacks standing to contest the policies of the prosecuting authorit[ies] when he himself is neither prosecuted nor threatened with prosecution." *Texas*, 599 U.S. at 674 (quotation marks omitted). Affording FreeState standing here "would entail expansive judicial direction" of the Commission's charge-processing policies. *Id.* at 681.

The Supreme Court in *Texas* "decline[d] to start the Federal Judiciary down that uncharted path[,]" *id.* at 681, when various states challenged DHS's arrest policies in a way that would force DHS "to make more arrests[,]" *id.* at 674. The Supreme Court addressed whether a court "may in effect order the Executive Branch to take enforcement actions against violators of federal law[,]" and concluded that, after a review of "this Court's Article III precedents and the historical practice, the answer is no." *Id.* at 685. As the Court pointed out, the Executive Branch "possesses authority to decide how to prioritize and how to aggressively pursue legal actions against defendants who violate the law." *Id.* at 678 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021)). And courts "generally lack meaningful standards for assessing the propriety of enforcement choices" given that "the Executive Branch must balance many factors when devising" its enforcement priorities. *Id.* at 679–80. Allowing the suit in *Texas* would spawn "complaints in future years

about alleged Executive Branch under-enforcement" of federal laws, suits that courts could not entertain given their "restricted role" under the separation of powers.  *Id.* at 681.

The result should be the same here.  FreeState asks this Court to judicially monitor and dictate how the Commission categorizes and investigates the tens of thousands of charges it receives each year.  Title VII charges the Commission to determine "whether reasonable cause exists" on a charge.  42 U.S.C. § 2000e-5(b).  Any procedures to reach that determination are part of the Commission's enforcement discretion, including the Priority Charge Handling Procedures and its agreements with FEPAs.  *See* Compl. ¶ 40 (acknowledging that the categorization system is based on "whether the EEOC determines that there is reasonable cause to believe discrimination occurred").  And although FreeState alleges that the Commission does not investigate certain charges, *see, e.g.*, *id.* ¶ 138, the timing and extent of an investigation is "the special province of the Executive Branch," *Trump v. United States*, 603 U.S. 593, 620 (2024) (citing *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)).

This Court cannot order the Commission to take a certain investigative approach, particularly given the volume of incoming charges, which was over 88,500 last year.  *See* Annual Report at 12.  After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing[,]" particularly when so many violations are alleged, and "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."  *Heckler*, 470 U.S. at 831–32.  FreeState thus invites this Court to cross a clear line between executive and judicial authority to micromanage the "many factors" that the Commission must consider in thousands of investigations and in tens of thousands of reasonable-cause determinations.  *Texas*, 599 U.S. at 680.  The separation of powers does not allow that kind of judicial review.

Moreover, the grist of FreeState's complaint is that the Commission has failed to prosecute certain charges submitted by transgender individuals. Whether because the Commission has dismissed ongoing lawsuits, *see* Compl. ¶ 73, or refuses to proceed with certain types of charges, *see id.* ¶ 82, the fundamental allegation is that the Commission has ceased prosecuting charges filed by transgender workers. Indeed, the Prayer for Relief asks this Court to enjoin the Commission from "categorically *declining to prosecute* new or ongoing litigation involving transgender workers." *Id.* at 40 (emphasis added). But it is well-established that "the refusal to prosecute cannot be the subject of judicial review." *ICC v. Locomotive Eng'rs*, 482 U.S. 270, 283 (1987); *see also Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (civil enforcement decisions brought by the federal government are presumptively an exclusive Executive power); *George Banat Co., Inc. v. NLRB*, 626 F.2d 354, 356–57 (4th Cir. 1980) (decision by NLRB not to prosecute was unreviewable). FreeState's complaint flies in the face of that precedent.

### 2.    FreeState Has Not Asserted A Cognizable Injury.

Even when viewed on an injury-by-injury basis, FreeState fails to allege an injury in fact. But before doing that analysis, FreeState's theory of standing must be determined. FreeState asserts various injuries to both itself "and its clients," leaving unresolved what theory FreeState is asserting. Compl. ¶ 116.

As an organization, FreeState can assert standing either in its own right—called organizational standing—or "as a representative of its members who have been harmed"—called associational standing. *PETA, Inc. v. Tri-State Zoological Park of W. Md.*, 843 F. App'x 493, 495 (4th Cir. 2021) (citing *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013)). The latter option is available to organizations with "indicia of membership," such as members electing the organization's leadership, serving in that leadership, and financing the organization's activities. *Hunt v. Wash.*

*State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977).  FreeState cannot establish associational standing because it does not purport to represent members of its organization in this lawsuit.  Nor can FreeState rely on its clients to establish associational standing, as there is no indication its clients serve as members of the organization—*i.e.*, they do not "play a role in selecting the organization's leadership, guiding the organization's activities, [or] financing the organization's activities."  *Nat'l Ass'n of Consumer Advocs. v. Gemini Tr. Co., LLC*, 757 F. Supp. 3d 59, 62 (D.D.C. 2024) (quotation marks omitted).  Thus, the only possible basis for standing is organizational standing.  "In determining whether organizational standing exists, 'a court conducts the same inquiry as in the case of an individual'" to identify an alleged injury in fact that is traceable to the challenged action and redressable.  *PETA, Inc.*, 843 F. App'x at 495 (quoting *Md. Highways Contractors Ass'n v. State of Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991)).

With the theory of standing figured out, consider the deficiencies in FreeState's allegations.  *First,* FreeState lacks a concrete interest to challenge the Commission's actions.  Regarding the dismissal of individual lawsuits, FreeState has no standing to challenge enforcement decisions that do not threaten it with prosecution.  *See Texas*, 599 U.S. at 677.  This is particularly true here because the dismissed suits identified by FreeState arose in states other than Maryland and thus did not involve the "LGBTQ+ Marylanders" that FreeState serves.  Compl. ¶ 132.  Even if the law afforded standing to an entity like FreeState in a suit like this—and it does not—FreeState has no relationship with or stake in EEOC lawsuits arising in states other than Maryland.

FreeState also lacks a concrete interest in the Commission's alleged failure to abide by "Title VII's requirement" that it "investigate all charges of discrimination."  Compl. ¶ 140.  "Not all procedural-rights violations are sufficient for standing[.]"  *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005).  Instead, the procedures in question must be "designed to

protect some threatened concrete interest," *Lujan*, 504 U.S. at 578 n. 8, specifically a "concrete interest *of the plaintiff*," *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) (emphasis added) (quotation marks omitted).

Here, the investigation requirement is not designed to protect the interest of a charging party or that party's legal-services organization. Congress endowed the Commission with enforcement powers to "vindicate the *public interest* in preventing employment discrimination," and the agency "is guided by [that] overriding *public interest* in equal employment opportunity," not an interest on behalf of private parties. *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 326 (1980) (emphases added) (quotation marks omitted). That is precisely why, "once a charge is filed . . . the EEOC is in command of the process," including management of the investigation. *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 291 (2002). During that time, the Commission is "the master of its own case" with the authority "to evaluate the strength of the public interest at stake" and to determine that the public interest does not justify a reasonable-cause finding. *Id.* The investigation requirement in 42 U.S.C. § 2000e-5(b) thus does not protect the interests of a charging party, but rather the public as a whole.

The same statute gives the EEOC "exclusive jurisdiction" over its case during the investigation, *id.*, and provides a role for charging parties only through post-investigation conciliation processes or a private civil action, *see* 42 U.S.C. § 2000e-5(b), (f)(1). There is no required role for a charging party during an investigation. *See* 29 C.F.R. § 1601.15(a) ("The investigation of a charge shall be made by the Commission, its investigators, or any other representative designated by the Commission."); *id.* § 1601.15(b) (noting that "[a]s part of the Commission's investigation," it "may require" the charging party to provide a statement). In short, the investigation requirement is not designed to protect a charging party such that the same party—

or its legal-services provider—has standing to sue over the conduct or progress of that investigation.

Even if FreeState could enforce the investigation requirement, it must have a "concrete interest that is affected by the deprivation" of an investigation. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). FreeState's interest appears to be informational based on a deprivation of information generated as part of an investigation, such as "employer position statements and supporting documentation." *See* Compl. ¶ 117. But to have a cognizable informational injury, FreeState must "lack access to information to which [it] is legally entitled." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017). FreeState is not entitled to position statements as a matter of course in every investigation. No statute or regulation requires the Commission to solicit a position statement from an employer in each investigation. One regulation says the Commission "will accept" such a statement if the employer "wishes to submit one," but it does not require the Commission to seek them. *See* 29 C.F.R. § 1601.15(a). Even FreeState does not allege that position statements are required in each investigation; the most FreeState says is that they are "typically" solicited. Compl. ¶ 44. And even if position statements are part of some EEOC investigations, FreeState cannot leverage an alleged interest in those statements to dictate how the Commission must conduct *each and every* investigation. In sum, FreeState has not alleged a cognizable injury that gives it standing to challenge the alleged failure of the Commission to investigate charges.

*Second*, FreeState's alleged diversion of organizational resources is insufficient to establish an injury in fact. An organization suffers an injury in fact when a defendant's action "perceptibly impairs [the] organization's ability to carry out its mission and consequently drains the organization's resources." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390,

395–96 (4th Cir. 2024) (cleaned up).  But "mere expense" of resources resulting from an organization's "own budgetary choices" is insufficient.  *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012).  Put another way, "an organization's uncompelled choice to expend resources" cannot confer standing.  *Republican Nat'l Comm.*, 120 F.4th at 396.  And an organization cannot "manufacture its own standing" "simply by expending money to gather information and advocate against the defendant's action."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

FreeState asserts that the Alleged Policy has forced it to expend additional resources in multiple ways.  But many of these expenditures relate to work that FreeState "always do[es]" in furtherance of its stated mission.  *Env't Working Grp. v. FDA*, 301 F. Supp. 3d 165, 172 (D.D.C. 2018).  For example, FreeState alleges that it has expended additional resources "to stay up-to-date on the state of the law and other information that workers need to make informed decisions about whether and when to file a charge of discrimination."  Compl. ¶ 128.  FreeState would normally expend money to keep up with the law as part of its "education and outreach" mission, *id.* ¶ 15, so any diversion of resources for that reason has not frustrated FreeState's purpose or mission.  *See Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 946 (D. Md. 2020) ("[P]rioritization of resources to combat a perceived ill does not constitute cognizable injury.").  Indeed, FreeState advertises that it conducts trainings on "specific legal topic areas."  *See* FreeState Justice, *Training*, https://www.FreeState-justice.org/trainings (last visited Oct. 15, 2025)*.*  To further this mission of education and outreach about the current state of the law, FreeState must expend resources to know what that law is.  Holding otherwise—*i.e.*, "that an organization that decides to spend its money on educating members" or its staff has standing—would imply "that any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another."  *Lane*, 703 F.3d at 675.

Similarly, FreeState cannot rely on allegations that it expended additional resources to file mixed claims in two fora, *see* Compl. ¶¶ 118–20, to assist transgender people with "secur[ing] alternate employment, *id.* ¶ 129, and to "settl[e] a case of employment discrimination directly with" an employer, *id.* ¶ 130.  Diverting resources to file claims of discrimination and to "settl[e] a case" qualify as the provision of "legal services," which is part of FreeState's stated mission. *Id.* ¶ 15.  Similarly, assistance to find alternative employment is consistent with the "linchpin" of FreeState's mission, namely to provide "freedom from all forms of unlawful discrimination in the workplace." *Id.* ¶ 131.  In short, the alleged expenditure of resources by FreeState is "in furtherance of [FreeState's] mission, not an injury to it." *Nat'l Fair. Hous. All. v. Bank of Am., N.A.*, 2025 WL 2030225, at *8 (D. Md. July 21, 2025).

*Third*, FreeState has not asserted cognizable harms regarding the MCCR process and the FEPA contracts.  As to the MCCR process, FreeState's complaint appears to be that the MCCR does not provide the same rigor as the Commission's process.  *See* Compl. ¶¶ 106–13.  This assertion of harm, however, amounts to an assertion that the Commission is not properly investigating because it is that alleged failure to investigate that has shunted FreeState and its clients into the MCCR process.  As discussed above, FreeState does not assert a concrete harm based on the Commission's failure to investigate.  *See supra* at 11–13.  Nor does FreeState identify such a harm in relation to the MCCR.  FreeState remains free to file charges with either the MCCR or the Commission, as it always has, given there is no allegation that either agency will not accept those charges.  Indeed, FreeState admits that it has advised transgender clients to file charges with MCCR.  *See* Compl. ¶ 105.  And the only required information to which FreeState and its clients are entitled is a right-to-sue letter after 180 days, and FreeState never alleges that those notices are not being issued by the Commission.

As for FEPAs, FreeState never alleges that state FEPAs—like MCCR, *see id.* ¶ 101—have ceased accepting charges for which they allegedly will no longer be reimbursed. Nor has FreeState identified a single instance where a FEPA has declined to accept or process a charge due to a lack of EEOC reimbursement. At most, then, FreeState's allegations require the Court to hypothesize about how FreeState or its clients are harmed. Such "conjectural or hypothetical" injuries are insufficient to confer standing. *Spokeo,* 578 U.S. at 339 (quotation marks omitted). And, because FreeState never alleges that its clients cannot file with FEPAs, the allegations about FEPA reimbursements present "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that does not confer standing. *Lance v. Coffman*, 549 U.S. 442 (2007).

Finally, even if FreeState's alleged injuries are cognizable, FreeState cannot assert them on behalf of parties not before the Court. The supposed inadequacies of the MCCR process hurt clients who have not "been able to settle with their employer." *Id.* ¶ 112. Similarly, the parties harmed by revoked FEPA reimbursements are the FEPAs who have allegedly lost money and FreeState's clients who allegedly must file twice.

FreeState cannot assert the rights of these other parties. "In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013) (quotation marks and brackets omitted). "This is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party." *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990). The exception permitting third party suits applies only when a plaintiff shows that: (1) it has "a close relationship with the person who possesses the right" and (2) there is "a hindrance to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (quotation marks omitted).

FreeState fails the hindrance prong because it has not alleged that the actual charging parties who must go through the MCCR process face "daunting" barriers or have "little incentive" to litigate the supposed inadequacy of that process. *Powers v. Ohio*, 499 U.S. 400, 414–15 (1991). FreeState cannot litigate charging parties' claims for them, even if FreeState suffers its own harm flowing from the alleged harm to its clients. *See, e.g.*, *Kowalski*, 543 U.S. at 129 n.2, 134 (holding lack of third-party standing for attorneys invoking nonparties' Sixth Amendment rights when challenging a statute limiting their ability to obtain clients, despite an undisputed pocketbook injury to the attorneys). And FEPAs likewise have no hindrance to their ability to challenge the Commission's alleged FEPA revocation. So even if FreeState has asserted cognizable injuries in fact, those injuries must be asserted by the parties actually injured. Except for the asserted injuries based on organizational resources, the injured party (and thus the proper plaintiff) is not FreeState.

### 3. FreeState's Asserted Injuries Are Not Redressable.

In addition to the failure to plead a viable injury in fact, FreeState's asserted injuries are not redressable by this Court. For an injury to be redressable, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation marks omitted). A plaintiff also must show "that the court has the power to grant the plaintiff's requested relief." *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020).

FreeState's requested relief is an order that dictates the procedures of the Commission, including categorization of certain charges, reinstatement of dismissed lawsuits, and whether the Commission will pay FEPAs. As discussed above, that request is not judicially cognizable. *See supra* at 8–10. It is also not redressable. "The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws." *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986). Judicial authority to review the exercise of that power is "at its most limited" in normal settings. *Id.*

Here it is "non-existent" because of the rule that a private citizen "has no interest in the prosecution or nonprosecution of another," and FreeState asserts such an interest. *Id.*; *see also Pinson v. U.S. Dep't of Just.*, 514 F. Supp. 3d 232, 242 n.2 (D.D.C. 2021) (noting that courts "typically cannot review" investigative decisions "at all"). It would be an "absurd and excessive extravagance" outside the Article III judicial power for this Court to dictate how the Commission must intake charges and enforce Title VII. *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866) (quotation marks omitted). In addition, as to FreeState's assertion that the lack of investigations has prevented FreeState from obtaining certain information, that theory "requires speculation about how [the Commission] might choose to exercise its enforcement discretion" regarding which investigations to pursue and which information to solicit. *Am. First Leg. Found. v. Greer*, — F.4th —, 2025 WL 2810813, at *3 (D.C. Cir. Oct. 3, 2025). "[C]ourts generally may not compel" how an agency chooses to exercise that discretion, meaning that FreeState's informational injury, even if a cognizable injury in fact, is not redressable. *Id.*

Because this Court cannot dictate how the Commission chooses whom to investigate or prosecute, FreeState's injuries are not "of the kind traditionally redressable in federal court" and the requested relief would push this Court "beyond its proper role in a system of separated powers." *Maryland v. USDA*, 151 F. 4th 197, 212 (4th Cir. 2025) (quotation marks omitted).

### B. The APA Precludes Jurisdiction Over FreeState's APA Claims.

Even if FreeState's claims are justiciable, this Court lacks subject matter jurisdiction over FreeState's APA claims. The APA waives sovereign immunity for a limited set of suits, and "sovereign immunity is jurisdictional in nature." *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, 990 F.3d 834, 839 (4th Cir. 2021). "Thus, a court may entertain suits against the federal government under the APA only within the scope of its waiver," found in 5 U.S.C. § 704. *Id.* The Court lacks jurisdiction here because FreeState has not alleged a "final agency action" and

there is another "adequate remedy in court" for FreeState's claims.  5 U.S.C. § 704.  The Court also may not "exercise jurisdiction over an APA claim" when the challenged action is "committed to agency discretion by law."  *Lovo v. Miller*, 107 F.4th 199, 205–06 (4th Cir. 2024) (quoting 5 U.S.C. § 701(a)(2)).

### 1.  FreeState Does Not Challenge A Discrete, Final Agency Action.

FreeState must plead "an identifiable action or event" and "direct its attack against some particular agency action that causes it harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891, 899 (1990) (quotation marks omitted) (*Nat'l Wildlife Fed'n*).  That final agency action must be "circumscribed [and] discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). "When challenging agency action—whether it be a particular action or a failure to act altogether—the plaintiff must therefore identify specific and discrete governmental conduct, rather than launch a broad programmatic attack on the government's operations." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (quotation marks omitted).  This limitation is "vital to the APA's conception of the separation of powers" because it prevents courts from "engag[ing] in day-to-day oversight of the executive administrative practices." *Id.*

Here, FreeState does not challenge an identifiable "discrete" action.  Far from presenting a "narrow question to resolve," *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006), the Alleged Policy amalgamates the dismissal of individual actions by the Commission, *see* Compl. ¶ 73, changes to the processing of charges submitted by transgender individuals, *see id.* ¶¶ 77–84, and a change to how the Commission reimburses FEPAs, *see id.* ¶¶ 85–92.  FreeState cannot lump together these individual actions and invent a freestanding policy subject to APA review.  In that sense, the "Trans Exclusion Policy," as FreeState calls it, is not one policy but "the name by which [FreeState] ha[s] occasionally referred" to the day-to-day operations of the Commission.  *Nat'l Wildlife Fed'n*, 497 U.S. at 890.  "All governmental programs are the aggregation of individual

decisions," and the APA "ensures that it is the individual decisions that are assessed as agency action." *City of New York*, 913 F.3d at 433; *see Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) ("[A]s used in the APA," action "is a term of art that does not include all conduct.").

Even if the Alleged Policy were sufficiently discrete, it would still not constitute final agency action. To be final, the challenged action must "mark the consummation of the agency's decisionmaking process" and must "be one by which rights or obligations have been determined, or from which legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

The Alleged Policy meets neither prong. FreeState alleges that the Policy has "purportedly shifted over time," Compl. ¶ 128, thereby admitting that it has not yet been finalized and thus is not the "consummation of the [Commission's] decisionmaking process." *Bennett*, 520 U.S. at 178 (quotation marks omitted). It would be "wholly novel" to review an action "not yet promulgated, the final form of which has only been hinted at." *EPA v. Brown*, 431 U.S. 99, 104 (1977).

The Policy also fails the second *Bennett* prong because, as alleged, the Policy affects no legal rights. Changes to the charge-processing system are processing decisions antecedent to a reasonable-cause decision. "As a general matter, the EEOC's reasonable cause determinations are not final agency actions subject to judicial review." *Bell Atl. Cash Balance Plan v. EEOC*, 1999 WL 485679 (4th Cir. July 12, 1999) (quotation marks omitted). The Fourth Circuit has already held as much. In *Georator Corp. v. EEOC*, an employer sought judicial review of the Commission's determination that there was reasonable cause to believe a charge filed against the employer was true. *See* 592 F.2d 765, 767 (4th Cir. 1979). The Fourth Circuit rejected the employer's argument that the reasonable-cause determination was a final agency action under 5 U.S.C. § 704. Although *Georator* predated the *Bennett* test, the court noted that "the touchstone

of [APA] finality" was "the fixing of obligations or legal relationships." *Id.* at 768. "No such finality exists with respect to the EEOC's determination of reasonable cause" because that determination "can fix no obligation nor impose any liability." *Id.* Rather, "[i]t is merely preparatory to further proceedings" in the form of a lawsuit against the employer. *Id.* Only then will "the issue of discrimination . . . come to life[.]" *Id.* Simply put, the Commission's determination of reasonable cause "has no effect until either the Commission or the charging party brings suit in district court." *Id.* at 769.

*Georator* controls here. Shorn of artful language, FreeState merely alleges that the Commission has already determined that certain kinds of charges filed by transgender workers do not, as a category, support a reasonable-cause determination. A key allegation, for example, is that the Commission has categorized charges filed by transgender charging parties as C charges, meaning "the EEOC has determined [they] are meritless and suitable for dismissal." Compl. ¶ 79. That determination carries no legal ramifications. As the *Georator* court acknowledged, the reasonable-cause determination is just a "preparatory" step. 592 F.2d at 768. No liability or rights are decided until either (1) the employee sues the employer, if the Commission does not believe there is reasonable cause for the charge; or (2) the Commission does believe there is reasonable cause and sues the employer. *See id.* "[O]nly the district court may fix liability." *Ward v. EEOC*, 719 F.2d 311, 313–14 (9th Cir. 1983).

Because the eventual decision regarding reasonable cause determines no rights, neither do the intermediate steps leading to that decision, such as "negligence or inaction in the internal processing of a [charge]." *Id.* at 313. For that reason, multiple courts have held that how the Commission investigates and processes charges of discrimination are not final agency actions under the APA. *See Georator*, 592 F.2d at 768; *Bell Atl.*, 1999 WL at *4 (plaintiff had "no general

right to judicial review of the EEOC's decision to investigate the discrimination charges"); *Ward*, 719 F.2d at 313–14; *Freeman v. Beverly*, 2020 WL 2747392, at *4 (D. Md. May 27, 2020) ("[T]he EEOC's investigation and enforcement decisions visit no prejudice on the rights of the charging party. Consequently, the EEOC's determination is not a final agency decision subject to judicial review." (cleaned up)). Similarly, the Commission's dismissal of individual lawsuits and changes to FEPA reimbursement do not create legal consequences. In both scenarios, the charging party remains free to sue.

### 2. There Is An Adequate Alternative Remedy In A Court.

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). "[T]he alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the same genre." *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). And judicial review under § 704 "ordinarily is not available when a different statute provides 'an opportunity for de novo district-court review' of an agency decision." *Nielsen v. Hagel*, 666 F. App'x 225, 231 (4th Cir. 2016) (quoting *Garcia*, 563 F.3d at 522).

Here, the adequate alternative remedy is the private right of action afforded by Title VII. *See* 42 U.S.C. § 2000e-5(f)(1). That right of action entitles FreeState's clients to sue their employers directly. And those clients will receive "[d]e novo consideration" of their discrimination claims as part of those lawsuits. *Chandler v. Roudebush*, 425 U.S. 840, 844 (1976). Thus, as multiple courts have held, the Title VII direct action is an adequate remedy precluding APA review of alleged inadequacies in the processing of a charge by the Commission. *See Ward*, 719 F.2d at 314 (Title VII right of action was "an adequate remedy in a court for the alleged shortcomings in the EEOC's handling of the plaintiffs' charges." (quotation marks omitted));

22

*Nielsen*, 666 F. App'x at 231 (Title VII cause of action was adequate remedy to challenge of "procedural errors by the agency's EEO office" and that same principle applied "irrespective [of] whether the alleged discriminating entity is a private party or a governmental agency."); *Terry v. Dir., Complaint Adjudication Div., U.S. EEOC, Off. of Fed. Operations*, 21 F. Supp. 2d 566, 569 (E.D. Va. 1998) (same and collecting authorities).  These precedents reflect that "Congress intended the private right of action provided for in section 706(f)(1) of the Act (42 U.S.C. § 2000e-5(f)(1)) . . . to serve as the remedy for any improper handling of a discrimination charge by the EEOC." *Smith v. Casellas*, 119 F.3d 33, 34 (D.C. Cir. 1997) (per curiam).

That reasoning forecloses jurisdiction over FreeState's APA claims.  The challenges to how the Commission processes charges submitted by transgender individuals or what agreements it makes with FEPAs for charge processing are allegations about the Commission's handling of charges.  *See, e.g.*, Compl. ¶ 165 ("Indeed, the EEOC has already ceased processing such charges[.]").  And although a Title VII plaintiff might believe it lacks certain pre-suit information, that plaintiff can still bring a lawsuit and seek discovery on their claims.  That is an adequate alternative remedy.

### 3.  EEOC's Enforcement Decisions Are Committed To Agency Discretion By Law.

In addition to identifying a final agency action, FreeState "must clear the hurdle of § 701(a)," *Heckler*, 470 U.S. at 828, which provides that APA review is unavailable if "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2).  That provision forecloses judicial review in at least two circumstances.  First, review is unavailable if the challenged agency action is of a kind "traditionally regarded as committed to agency discretion," including various categories of discretionary judgments that "require[] 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Lincoln v. Vigil*, 508 U.S. 182, 192-

93 (1993) (quoting *Heckler*, 470 U.S. at 831).  Second, section 701(a)(2) applies if the "relevant statute" underlying the plaintiff's APA challenge "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Id.* at 191 (quoting *Heckler*, 470 U.S. at 830).

Applying this framework, the Supreme Court has identified various types of agency decisions for which review is "general[ly] unsuitab[le]" because they implicate judgments about policy or resource allocation within the core of an agency's discretion and expertise.  *Heckler*, 470 U.S. at 831.  Chief among these, section 701(a)(2) generally bars review of agency decisions to initiate or forego enforcement actions.  *See id.* at 831–32; *Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 317–19 (4th Cir. 2008); *Sierra Club v. Larson*, 882 F.2d 128, 132–33 (4th Cir. 1989); *see also Arizona v. Biden*, 40 F.4th 375, 389 (6th Cir. 2022) (internal memorandum outlining "immigration enforcement priorities" is unreviewable).  Like other discretionary contexts, courts have refused to review enforcement decisions because the agency's decision is based on "a complicated balancing of number of factors which are peculiarly within [the agency's] expertise."  *Speed Mining*, 528 F.3d at 318 (quoting *Heckler*, 470 U.S. at 831).  "The [agency] is far better equipped than the courts to balance these factors and determine its enforcement priorities."  *Id.* at 318 (quoting *Heckler*, 470 U.S. at 831).

FreeState's claims challenge actions undertaken as part of the Commission's enforcement discretion.  Start with FreeState's complaints about the Commission's administration of its charge intake and processing procedures.  Title VII does not specify how the Commission should determine that there is reasonable cause underlying a particular charge.  Rather, EEOC is "the master of its own case."  *Waffle House*, 534 U.S. at 291.  No provision requires the Commission to adopt a particular intake system or a particular investigative approach.  "As to these points, the

statute is silent. Therefore, there is no law to apply" to judge how the Commission chooses to exercise its prosecutorial discretion regarding charges submitted by any charging parties. *Larson*, 882 F.2d at 132. Moreover, the considerations that inform the Commission's intake and investigation process include decisions about "whether a violation has occurred," "whether agency resources are best spent on this violation or another," "whether the agency is likely to succeed if its acts," and "whether the particular enforcement action . . . best fits the agency's overall policies." *Heckler*, 470 U.S. at 831.

More concretely, the Commission must determine the threshold for what qualifies as a B charge versus a C charge and how many resources to devote to each type of charge. That is a policy-laden question that this Court cannot answer for the Commission without some statutory standard from Congress. Seeing none, how the Commission administers its investigatory system is committed to the Commission's discretion. Accepting any other argument "could lead to court intervention in all decisions not to pursue further action after preliminary investigations," a foray of reviewability that the separation of powers would not countenance. *Larson*, 882 F.2d at 133. And although FreeState alleges that transgender charging parties have been deprived of various Commission procedures, Title VII does not dictate how the Commission should "discriminate among issues or cases it will pursue." *Heckler*, 470 U.S. at 833. Thus, the charges that the Commission chooses to pursue rest in the Commission's discretion.

The same is true for the Commission's decision to dismiss lawsuits. *See* Compl. ¶ 73. Those dismissals are an exercise of the Commission's discretion over which enforcement actions to bring. "[T]he decision not to bring an administrative enforcement action is committed to agency discretion by law and therefore unreviewable." *Citizens for Responsibility and Ethics in Washington v. Fed. Elec. Comm'n*, 993 F.3d 880, 888 (D.C. Cir. 2021) (*CREW*) (quotation marks

omitted).  A contrary conclusion would "deprive the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States."  *Swift v. United States*, 318 F.3d 250, 253 (D.C. Cir. 2003).  *Cf. Balt. Gas and Elec. Co. v. FERC*, 252 F.3d 456, 460 (D.C. Cir. 2001) (agency decision to settle an enforcement action was "a paradigmatic instance of an agency exercising its presumptively nonreviewable enforcement discretion").

Arguably the only nondiscretionary duty imposed on the Commission is that it "shall" investigate each submitted charge.  42 U.S.C. § 2000e-5(b).  FreeState emphasizes repeatedly that the Commission has ceased the required investigation process.  *See, e.g.*, Compl. ¶¶ 10, 12, 140.  But the allegations do not support that.  Categorizing certain charges as C charges, *see id.* ¶ 79, *itself* requires an investigation in that Commission staff reviews the contents of the charge before categorizing it.  How else will staff know that the charge is suitable for dismissal?  So too for the "heightened level of review" challenged by FreeState in that the Commission looks at the contents of "all charges alleging gender-identity discrimination."  *Id.* ¶ 84.  Thus, there is no question that the Commission is meeting a duty to investigate, even under FreeState's allegations; the issue is that FreeState thinks the investigations should involve additional work.

FreeState's argument to the contrary appears to be that these investigations are insufficient because they don't involve position statements and other information.  *See id.* ¶ 117.  But again, Congress did not require the Commission to solicit such information as part of every investigation.  Whether the Commission does so is a question of resources and the likelihood of success, considerations that this Court is ill-suited to question.  *See Heckler*, 470 U.S. at 831.  In much the same way that the Supreme Court could not "impose extra procedural requirements" on the Commission's duty to seek conciliation, so too this Court cannot dictate the Commission's investigative procedures without congressional authority.  *Mach Mining, LLC v. EEOC*, 575 U.S.

480, 492 (2015). "Such judicial review extends too far" and contradicts the "abundant discretion the law gives the EEOC" to investigate charges. *Id.* at 492, 495. It also "expend[s] scarce resources and would delay and divert EEOC enforcement actions from furthering the purpose behind Title VII." *EEOC v. Sterling Jewelers, Inc.*, 801 F.3d 96, 101–02 (2d Cir. 2015).

If the Commission's activities do not qualify as an investigation, the Commission argues in the alternative that the "shall" investigate language in 42 U.S.C. § 2000e-5(b) does not impose a mandatory duty to investigate all incoming charges. Given the "deep-rooted nature of law enforcement discretion," *Texas*, 599 U.S. at 682, the use of "shall" in a statute "is not sufficient" to displace the Commission's traditional enforcement discretion, *Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011). As the Supreme Court has explained, laws granting authority to government actors frequently "use the word 'shall' to authorize, but not to require . . . action." *De Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) (pointing to examples in the Federal Rules). The Supreme Court has held multiple times that a statutory "shall" did not displace an agency's enforcement discretion. In *Texas*, for example, the Court refused to "enter appropriate orders requiring additional arrests" despite statutory language that the Federal Government "shall take into custody" certain noncitizens. 599 U.S. at 682; *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (statutory language that police officers "shall use every reasonable means to enforce a restraining order" did not displace traditional enforcement discretion).

So too here. The use of "shall" in Title VII cannot displace the Commission's traditional enforcement discretion to "decide when to investigate." *Cmty. for Creative Non-Violence*, 786 F.2d at 1201. This grant of discretionary authority makes sense given "the nature of the administrative action at issue." *CREW*, 993 F.3d at 890 (quotation marks omitted). It is implausible that Congress meant to require an equal, comprehensive investigation into every

charge filed with the Commission given the volume of those charges. In 2024 alone, the Commission received more than 88,000 charges. *See* Annual Report at 6. Yet Congress has equipped the Commission with limited resources. "It is simply not plausible to suggest that such a limited body" would be able to perform its duty if it "were forced to conceive of each and every [investigation] as a point of exposure to litigation[.]" *Am. Fed'n of Gov't Emps v. Off. of Special Counsel*, 1 F.4th 180, 190 (4th Cir. 2021). Indeed, Congress acknowledged that the Commission would not reach particular investigatory milestones on every charge by allowing a charging party to receive notice of right to sue if the Commission has not filed a lawsuit or entered into a conciliation agreement within 180 days. *See* 42 U.S.C. § 2000e-5(f)(1). At the very least, requiring any particular degree of investigation into each charge of discrimination would diminish the Commission's effectiveness by diverting agency resources away from the most meritorious charges.[4]

*   *   *

In sum, FreeState does not have standing for any of its claims. Even if it does have standing, this Court lacks jurisdiction over FreeState's APA claims because the APA bars judicial review.

## II.    FreeState's Procedural Challenges Fail On Other Grounds.

In addition to the above jurisdictional arguments, FreeState's procedural challenges fail under Rule 12(b)(6).

***Lack of a Quorum.*** First, FreeState alleges that the Commission cannot "act without a quorum" and that, by adopting the supposed Policy, the Commission is acting *ultra vires* and

---

[4] Because the Commission is investigating each charge and, in the alternative, there is no mandatory duty to investigate each charge, FreeState fails to state a claim in the portion of Count I alleging *ultra vires* action due to a failure to investigate and in the portion of Count IV alleging action contrary to law due to the same failure to investigate. *See* Compl. ¶¶ 138–39, 177.

28

contrary to law.  Compl. ¶ 139, *see also* ¶ 177.  *Ultra vires* review is "necessarily narrow" in that the Court reviews only "whether a public entity has acted within the bounds of its authority or overstepped them."  *Ancient Coin Collectors Guild v. CBP*, 698 F.3d 171, 179 (4th Cir. 2012) (quotation marks omitted).  The Commission has not overstepped its authority regarding action without a quorum.  Title VII delegates responsibility to the Chair for the "administrative operations of the Commission," which include all facets of the purported Policy.  42 U.S.C. § 2000e-4(a).  Moreover, if that were not enough, Commission regulations delegate the authority to make determinations on most charges to specific officials such that the lack of a quorum does not affect the processing of individual charges.  *See* 29 C.F.R. § 1601.18(c) (delegating determinations for dismissal of charges to specific officials); § 1601.19(a) (delegating no cause determinations to specific officials); § 1601.20(a) (delegating settlement authority prior to reasonable cause determinations); § 1601.21(d) (delegating authority to make reasonable cause determinations "except" in cases "involving issues currently designated by the Commission for priority review").

Because FreeState has not alleged a statutory violation, much less a "clear, specific statutory command," it has not stated a cognizable *ultra vires* claim.  *Fresno Cmty. Hosp. and Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021).  Nor has it stated an APA contrary-to-law claim regarding action in the absence of a quorum.  Combined with FreeState's failure to allege a violation of a mandatory duty to investigate, *see supra* at 26–27 & n.4, Counts I and IV should be dismissed.

***Notice and Comment Rulemaking.***  FreeState alleges that the Policy "is a 'rule'" that should have gone through notice-and-comment procedures.  Compl. ¶ 188.  The APA requires notice and comment for substantive or legislative rules but does not require those procedures for general statements of policy or rules of agency organization, procedure, or practice.  *See* 5 U.S.C.

29

§ 553(b)(A); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96–97 (2015). Statements that "have the force of law and create new law or impose new rights or duties" are substantive rules requiring notice and comment. *Casa de Md. v. Dep't of Homeland Security*, 924 F.3d 684, 702 (4th Cir. 2019). By contrast, statements that "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power" are general statements of policy. *Id.* (quotation marks omitted).

Here, the allegations do not support that the Alleged Policy has the force of law. As discussed above, dismissing an enforcement action, issuing a reasonable-cause determination, or declining reimbursement for FEPAs does not carry "the force and effect of law." *Id.* at 701. The charging party remains free to sue the employer directly in federal district court, which will establish liability and any obligations therefrom, and FEPAs remain free to accept charges filed by transgender people. *See supra* at 20–22. Based on these allegations then, the Commission is simply advising how it will exercise its discretionary power over the charge processing system, what enforcement actions the Commission intends to bring or not bring, and whether it will reimburse FEPAs. Such statements about how an agency "will exercise its broad enforcement discretion" are general statements of policy exempt from notice-and-comment rulemaking. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).[5] Count VI should be dismissed.

## CONCLUSION

The Court should grant the Commission's Motion to Dismiss and dismiss the Complaint.

---

[5] The alleged Policy is also not a rule because it combines multiple actions into one. The APA defines a "rule" in the singular as "an agency statement." 5 U.S.C. § 551(4). Plaintiffs making this claim thus often challenge one document proclaiming agency policy. *See, e.g., Casa de Md.*, 924 F.3d at 694. Here, by contrast, FreeState improperly bundles together multiple actions and claims they are one agency statement.

30

Dated: October 15, 2025                    Respectfully submitted,


                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

                                           YAAKOV M. ROTH
                                           Principal Deputy Assistant Attorney General
                                           Civil Division

                                           DIANE KELLEHER
                                           Director
                                           Federal Programs Branch

                                           JOHN BAILEY
                                           Counsel to the Assistant Attorney General
                                           Civil Division

                                           */s/ Christian Dibblee*
                                           CHRISTIAN DIBBLEE
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street, N.W.
                                           Washington, D.C. 20005
                                           Tel: (202) 353-5980
                                           Email: Christian.R.Dibblee@usdoj.gov

                                           *Counsel for Defendants*