**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| FREESTATE JUSTICE, | |
| *Plaintiff*, | |
| v. | **Civil Case No. 1:25-cv-02482-GLR** |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | |
| and | |
| ANDREA LUCAS, in her official capacity as ACTING CHAIR OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| *Defendants*. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................... ii

Introduction .............................................................................................................1

Factual Background .................................................................................................2

Standard of Review .................................................................................................7

Argument .................................................................................................................8

I.    FreeState has standing to challenge the Trans Exclusion Policy. ...................8

      A.    FreeState has alleged concrete injuries arising from the Trans Exclusion
            Policy. ..................................................................................................8

            1.    The Policy has impaired FreeState's ability to advocate for its
                  transgender clients and advance the rights of transgender
                  Marylanders. .............................................................................8

            2.    FreeState has suffered an informational injury. ..........................12

            3.    Defendants' arguments to the contrary are unavailing. ...............12

      B.    FreeState's injuries are redressable by the Court. ..................................14

      C.    Defendants' enforcement discretion does not foreclose FreeState's standing. .....15

II.   FreeState's claims are reviewable under the APA ...........................................19

      A.    The Trans Exclusion Policy is discrete, final agency action. ...............19

            1.    The Policy is sufficiently discrete. ..............................................19

            2.    The Policy is final. ......................................................................20

      B.    FreeState has no adequate alternative remedy in court. .......................23

      C.    The final agency action was not committed to agency discretion by law. ...........24

III.  FreeState has adequately alleged that the Trans Exclusion Policy violates Title
      VII and the APA. ............................................................................................29

Conclusion .............................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Adams v. Richardson*,
  480 F.2d 1159 (D.C. Cir. 1973) ........................................................................... 25

*AFL-CIO v. Department of Labor*,
  778 F. Supp. 3d 56 (D.D.C. 2025) ....................................................................... 10

*Al Otro Lado, Inc. v. McAleenan*,
  394 F. Supp. 3d 1168 (S.D. Cal. 2019) .............................................................. 20

*Am. Acad. of Pediatrics v. FDA*,
  379 F. Supp. 3d 461 (D. Md. 2019) ............................................................... 12, 28

*Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ...................................................................................... 20, 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 7

*Azar v. Allina Health Servs.*,
  587 U.S. 566 (2019) ........................................................................................... 28

*Bell Atl. Cash Balance Plan v. EEOC*,
  No. 97-2382, 1999 WL 485679 (4th Cir. July 12, 1999) .............................. 22, 22

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................................... 20, 21

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ............................................................................................. 4

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ........................................................................................... 24

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ............................................................................................... 18

*Capital Area Immigrants' Rts. Coal. v. Trump*,
  471 F. Supp. 3d 25 (D.D.C. 2020) ....................................................................... 10

*Casa de Maryland v. DHS*,
  924 F.3d 684 (4th Cir. 2019) ............................................................ 19, 25, 26, 29, 30

*Cath. Legal Immigr. Network, Inc. v. Exec. Office for Immigr. Review*,
    513 F. Supp. 3d 154 (D.D.C. 2021) ................................................................... 12

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ........................................................................... 18

*Child Trends, Inc. v. Dep't of Educ.*,
    No. 8:25-cv-01154, 2025 WL 2379688 (D. Md. Aug. 15, 2025) ...................... 20

*City of New York v. Dep't of Defense*,
    913 F.3d 423 (4th Cir. 2019) ............................................................................. 19

*Crowley Caribbean Transp., Inc. v. Pena*,
    37 F.3d 671 (D.C. Cir. 1994) ............................................................................. 25

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ........................................................................................... 24

*Edmondson Cmty. Org., Inc. v. Mayor of Baltimore*,
    No. 1:24-cv-01921, 2025 WL 2430345 (D. Md. Aug. 22, 2025) ................. 11, 11

*EEOC v. Shell Oil Co.*,
    466 U.S. 54 (1984) .......................................................................................... 2, 6

*Elec. Privacy Info. Ctr. v. DHS*,
    653 F.3d 1 (D.C. Cir. 2011) ......................................................................... 29, 29

*Elecs. of N.C. v. S.E. Power Admin.*,
    774 F.2d 1262 (4th Cir. 1985) ........................................................................... 26

*EPA v. Brown*,
    431 U.S. 99 (1977) ............................................................................................. 21

*Evans v. B.F. Perkins Co.*,
    166 F.3d 642 (4th Cir. 1999) ............................................................................... 7

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................................................. 8

*Fed. Election Comm'n v. Akins*,
    524 U.S. 11 (1998) ............................................................................................. 12

*Freeman v. Beverly*,
    No. 8:19-cv-01784, 2020 WL 2747392 (D. Md. May 27, 2020) ....................... 23

*Ft. Bend Cnty. v. Davis*,
    587 U.S. 541 (2019) .................................................................................... 2

*Garcia v. Neagle*,
    660 F.2d 983 (4th Cir. 1981) ...................................................................... 26

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) .................................................................... 23

*Georator Corp. v. EEOC*,
    592 F.2d 765 (4th Cir. 1979) ...................................................................... 22

*George Banta Co. v. N.L.R.B.*,
    626 F.2d 354 (4th Cir. 1980) ...................................................................... 18

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .................................................................................... 8

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ........................................................................ 17, 24, 27

*ICC v. Locomotive Engineers*,
    882 F.2d 128 (4th Cir. 1989) ...................................................................... 26

*Inova Alexandria Hosp. v. Shalala*,
    244 F.3d 342 (4th Cir. 2001) .............................................................. 26, 27, 28

*Interstate Commerce Commission v. Locomotive Engineers*,
    482 U.S. 270 (1987) .................................................................................... 17

*King v. Burwell*,
    759 F.3d 358 (4th Cir. 2014) ...................................................................... 23

*Laufer v. Naranda Hotels, LLC*,
    60 F.4th 156 (4th Cir. 2023) ...................................................................... 12

*Liberty Univ. v. Lew*,
    733 F.3d 72 (4th Cir. 2013) ........................................................................ 8

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ............................................................................ 27, 28

*Lucero v. Early*,
    873 F.3d 466 (4th Cir. 2017) ...................................................................... 7

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................ 8

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) .............................................................................................. 20

*Lusardi v. Dep't of the Army, EEOC Appeal No. 0120133385*,
    2015 WL 1607756 (2015) ...................................................................................... 4

*Mach Mining, LLC v. EEOC*,
    575 U.S. 480 (2015) ...................................................................... 2, 4, 17, 18, 28

*Macy v. DOJ, EEOC Appeal No. 0120120821*,
    2012 WL 1435995 (2012) ...................................................................................... 4

*McLane Co. v. EEOC*,
    581 U.S. 72 (2017) ...................................................................................... 4, 22, 29

*N.C. State Conf. of the NAACP v. Raymond*,
    981 F.3d 295 (4th Cir. 2020) ............................................................................... 8

*N.W. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
    496 F. Supp. 3d 31 (D.D.C. 2020) .................................................................... 12

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) .............................................................................................. 28

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ................................................................................................ 19

*Occidental Life Ins. Co. of Cal. v. EEOC*,
    432 U.S. 355 (1977) .............................................................................................. 28

*PETA v. Dep't of Agriculture*,
    797 F.3d 1087 (D.C. Cir. 2015) ............................................................... 8, 10, 11

*Pub. Citizen Health Rsch. Grp. v. Acosta*,
    363 F. Supp. 3d 1 (D.D.C. 2018) ...................................................................... 15

*R.I.L.-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) .................................................................... 20

*Rel. Soc'y of Friends v. DHS*,
    767 F. Supp. 3d 293 (D. Md. 2025) .................................................................. 16

*RNC v. N.C. State Bd. of Elections,*
   120 F.4th 390 (4th Cir. 2024) ........................................................... 11, 13

*Sierra Club v. Dep't of Interior,*
   899 F.3d 260 (4th Cir. 2018) ........................................................... 14, 26

*Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n,*
   528 F.3d 310 (4th Cir. 2008) ................................................................... 25

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ........................................................... 21, 22

*United States v. Texas,*
   599 U.S. 670 (2023) ............................................................... 14, 16, 17

*Venetian Casino Resort, L.L.C. v. EEOC,*
   530 F.3d 925 (D.C. Cir. 2008) ........................................................... 21, 26

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
   586 U.S. 9 (2018) ........................................................................ 24, 29

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ........................................................................... 19

*Winyah Rivers All. v. Active Energy Renewable Power, LLC,*
   579 F. Supp. 3d 759 (E.D.N.C. 2022) ...................................................... 14

**FEDERAL STATUTES**

5 U.S.C.
   § 552 ..................................................................................... 3
   § 701(a)(2) ......................................................................... 19, 24
   § 704 ................................................................................... 19
   § 706 ................................................................................... 24
   § 706(2)(A) ............................................................................ 24

42 U.S.C.
   § 2000e ................................................................................ 28
   § 2000e-4(c) ........................................................................... 27
   § 2000e-5(b) ..................................................................... *passim*
   § 2000e-5(f)(1) ...................................................................... 3, 4

**FEDERAL RULES**

Fed. R. Civ. P.
    Rule 12(b)(1)............................................................................................... 7

**OTHER AUTHORITIES**

EEOC, Freedom of Information Act,
    https://perma.cc/5SKU-T4VC ............................................................... 3

EEOC, Section 83 Disclosure of Information in Charge Files,
    https://perma.cc/V6U4-2GWH .............................................................. 3

Anne Noel Occhialino & Daniel Vail, *Why the EEOC (Still) Matters*,
    22 Hofstra Labor & Emp. L.J. 671 (2005)............................................. 4

## INTRODUCTION

Congress created the Equal Employment Opportunity Commission to enforce federal workplace civil-rights laws, including Title VII of the Civil Rights Act of 1964. Title VII prohibits employment discrimination because of race, sex (including sexual orientation and gender identity), color, religion, and national origin. But in derogation of that congressional command, the EEOC has recently adopted a policy (the "Trans Exclusion Policy") of refusing to investigate certain charges of discrimination (including harassment and retaliation charges) when filed by transgender individuals, instead categorically classifying them as meritless and subject to dismissal.

In its motion to dismiss, the government does not deny these allegations. Instead, it attempts to shield its unlawful policy from judicial review under the guise of enforcement discretion. But the government's arguments proceed from a mischaracterization of FreeState's allegations and legal claims as seeking review of the EEOC's prioritizing certain charges over others, or of its case-by-case decisions regarding individual charges. Whatever the legitimate scope of the EEOC's investigative discretion, it does not encompass blanket refusal to investigate certain charges of discrimination based on a charging party's protected characteristic. By the government's logic, the EEOC could categorically refuse to investigate charges of discrimination brought by Black charging parties, or Catholics, or men—effectively closing its doors to such persons—and the courts would lack authority to grant any relief from such unlawful and unconstitutional action.

The Court should reject the EEOC's startling arguments. At the motion-to-dismiss stage, FreeState has adequately alleged that the EEOC's Trans Exclusion Policy directly and palpably harms FreeState and that its harms are redressable by this Court. And FreeState's APA claims are reviewable. The government's motion to dismiss should be denied.

1

**FACTUAL BACKGROUND**

**I.   The EEOC is required to investigate charges of workplace discrimination.**

Congress vested the EEOC with "[p]rimary responsibility for enforcing Title VII" through an "integrated, multistep enforcement procedure that enables the Commission to detect and remedy instances of discrimination." *EEOC v. Shell Oil Co.*, 466 U.S. 54, 61-62 (1984). That process begins when a person files a charge with the EEOC. 42 U.S.C. § 2000e-5(b).[1]

Filing a charge triggers several steps. On receiving the charge, before undertaking any investigation, EEOC staff categorize the charge as an "A" charge (likely to result in a reasonable-cause determination), "B" charge (additional information required), or "C" charge (sufficient information obtained to conclude that a reasonable-cause determination is unlikely). Compl. ¶ 40. "C" charges may be dismissed at intake or soon thereafter. *Id.* Within ten days, the EEOC "shall serve a notice of the charge" on the employer, including details related to the "date, place and circumstances" of the alleged discrimination. *Id.* ¶ 41; § 2000e-5(b). For "A" and "B" charges, the EEOC may offer the parties voluntary mediation before initiating an investigation, allowing some parties satisfactory resolution before the EEOC even begins its investigation. Compl. ¶ 42. These measures come at no cost to charging parties and their representatives.

As directed by Congress, and as the Supreme Court has confirmed, the EEOC "shall make an investigation" of the charge and a "determination on reasonable cause as promptly as possible." § 2000e-5(b); *see Mach Mining, LLC v. EEOC*, 575 U.S. 480, 483 (2015). Investigations begin with requesting position statements from employers. Compl. ¶¶ 44-45. Completed investigation files may also include a host of other relevant documents, including interviews with management representatives and charging parties' co-workers, declarations from managers, information from

---

[1] Charge-filing is a mandatory prerequisite for anyone asserting rights under Title VII before filing suit in court. 42 U.S.C. § 2000e-5(f)(1); *see Ft. Bend Cnty. v. Davis*, 587 U.S. 541, 543 (2019).

third parties, personnel policies, comparator evidence regarding other employees that shed light on whether discrimination occurred, notes from on-site visits, and interview notes that contain rebuttals to the position statement from the charging party or other employees. Compl. ¶ 45.

If the EEOC finds reasonable cause to believe that discrimination occurred, it "shall endeavor to eliminate" the unlawful practice through "informal methods," including conciliation. § 2000e-5(b). If the parties fail to conciliate, the EEOC may file a lawsuit in federal court against the employer. *Id*. § 2000e-5(f)(1). Otherwise, the EEOC must issue the charging party a right-to-sue notice. *Id.* If the EEOC determines that there is no reasonable cause, it must dismiss the charge and issue the charging party a right-to-sue notice. *Id*. § 2000e-5(b).[2] Under the Freedom of Information Act, 5 U.S.C. § 552, the charging party or their representative may request the investigative file (containing the employer's position statement and any evidence the employer or anyone else produced to the EEOC) for up to ninety days after receiving a right-to-sue notice, or after filing suit against the employer.[3]

To help fulfill its enforcement responsibilities, the EEOC contracts with what it terms Fair Employment Practices Agencies ("FEPAs")—state and local agencies that enforce their own employment-discrimination laws. Compl. ¶¶ 52-53. The EEOC pays FEPAs to assume responsibility for also processing charges of violations of federal workplace civil-rights protections through work-sharing agreements with the EEOC. *Id.*

The EEOC's enforcement scheme—including its obligation to investigate charges and engage in conciliation when it has found reasonable cause—is *mandatory*. 42 U.S.C. § 2000e-5(b);

---

[2] If the EEOC does not complete its administrative processing of the charge within 180 days, the charging party may request a right-to-sue notice. 42 U.S.C. § 2000e-5(f)(1).

[3] *See* EEOC, Freedom of Information Act, https://perma.cc/5SKU-T4VC. The EEOC also provides a separate mechanism for a charging party or their representative to obtain their case file. *See* EEOC, Section 83 Disclosure of Information in Charge Files, https://perma.cc/V6U4-2GWH.

*McLane Co. v. EEOC*, 581 U.S. 72, 75 (2017); *Mach Mining*, 575 U.S. at 483. And its free benefits to charging parties, regardless of outcome, are many. *See ,e.g.*, Anne Noel Occhialino & Daniel Vail, *Why the EEOC (Still) Matters*, 22 Hofstra Labor & Emp. L.J. 671, 705 (2005) ("For the individuals whose charges are resolved through conciliation, the Commission's efforts spare the litigants the time and expense involved in finding and hiring a private attorney."). No investigation means no investigative file of EEOC-gathered evidence concerning the strength of the claims and no opportunity for EEOC-sponsored mediation, let alone EEOC-led and EEOC-funded litigation.

## II.  The EEOC has ceased enforcing certain Title VII protections for transgender workers.

In 2020, the Supreme Court confirmed that Title VII's bar on sex-based discrimination encompasses discrimination based on sexual orientation and gender identity. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 683 (2020). The EEOC had taken this position in federal-sector decisions beginning as early as 2013. *See Macy v. DOJ*, EEOC Appeal No. 0120120821, 2012 WL 1435995 (Apr. 20, 2012) (discrimination based on employee's transgender status is sex discrimination in violation of Title VII); *see also Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133385, 2015 WL 1607756 (Apr. 1, 2015) (repeated and intentional use of pronouns inconsistent with employee's gender is sex discrimination). Accordingly, until recently, the EEOC has investigated and made decisions to litigate charges of discrimination brought by transgender workers—including charges alleging harassment based on gender identity, retaliation, and the many other forms of adverse employment actions beyond hiring, firing, and promotion—on the same terms as other workers. *See* Compl. ¶¶ 54-61.

But the EEOC has dramatically changed course. *See id.* ¶¶ 62-92. Now, transgender workers receive protections against discrimination only in the limited contexts of hiring, firing, and promotions—and only then when those claims are brought in isolation, without accompanying harassment or retaliation claims. *Id.* ¶¶ 80-85. Meanwhile, cisgender workers continue to receive

the full set of EEOC charge-investigation and other enforcement protections against sex discrimination, harassment, retaliation, and all other forms of discrimination covered by Title VII. *Id.* Thus, under its Trans Exclusion Policy, the EEOC is denying only transgender charging parties certain Title VII-mandated protections. *Id.*

### III.  The EEOC's Trans Exclusion Policy harms FreeState.

FreeState serves Maryland's LGBTQ+ population by providing free legal services, legislative advocacy, and education and outreach programming. Its mission is to ensure that LGBTQ+ people are free to live authentically, with safety, dignity, and respect. *Id.* ¶ 99.

One of FreeState's core services is helping clients who have experienced workplace discrimination file EEOC charges to address and remedy that discrimination. *Id.* ¶ 100. Before the Trans Exclusion Policy, FreeState advised clients to file EEOC charges of discrimination, helped them initiate the process, and helped them navigate its subsequent stages. *Id.* ¶¶ 101-02. FreeState drafted charges; supported charging parties through mediation; reviewed the investigative file, including employer position statements and other documents produced by the EEOC; drafted employee responses to employer position statements; prepared its clients for and joined interviews with the assigned EEOC investigator; joined conciliation negotiations and advised clients about the terms of settlement offers; and provided guidance about the costs and benefits of litigation. *Id.* ¶¶ 101-02. For matters that did not settle, FreeState would seek pro bono legal assistance for its clients. *Id.* ¶ 103-04.

Since the Trans Exclusion Policy took effect, FreeState has ceased advising its transgender clients to file charges of discrimination with the EEOC. *Id.* ¶ 105. While FreeState's clients can file charges of discrimination with the Maryland Commission on Civil Rights ("MCCR"), Maryland's FEPA, MCCR's charge-investigation process is not an equal substitute for the

EEOC's. *Id.* ¶¶ 106-113. For example, the state-agency process tends to take longer and provides charging parties with less, or no, information and fewer resolutions.[4] *Id.*

The Trans Exclusion Policy deprives FreeState and its clients of the benefits of the EEOC's charge-investigation process and the rest of the enforcement process. *Id.* ¶ 114. That process is not just a perfunctory precursor to filing a lawsuit; rather, Congress established it as one of the "thoroughgoing remedies" to address the "'complex and pervasive' problem" of unlawful discrimination, *Shell Oil*, 466 U.S. at 69-70. It can not only lead to relief for individual clients, but also spur improvements and policy changes for an entire workplace, set of employers, industry, or region—sometimes even nationwide. Compl. ¶ 114. The Policy has thus impaired FreeState's ability to redress workplace discrimination not just for its transgender clients, but also on behalf of transgender communities in Maryland more broadly, impeding FreeState's ability carry out a core service in fulfillment of its mission. *Id.* ¶ 114-15.

The Policy also deprives FreeState of information it would be entitled to receive from the EEOC. Losing access to that information impairs FreeState's ability to formulate an informed response to the employer's assertions and present the strongest case possible, which in turn affects the likelihood of settlement. Compl. ¶ 117. It also impairs FreeState's ability to secure pro bono representation for its clients. *Id.*

Additionally, because the Trans Exclusion Policy sends transgender workers the message that their charges of discrimination will not be taken seriously, it disincentivizes them from filing with the EEOC. *Id.* ¶ 122. Indeed, several potential clients have declined to use FreeState's legal services to file EEOC charges, further impairing FreeState's ability to redress employment

---

[4] Given the EEOC's decision not to pay FEPAs for *any* charges brought by transgender applicants or workers, *see* Compl. ¶¶ 86-92, it is unclear whether MCCR will continue to accept such charges at all.

discrimination for those individual workers and for the broader transgender and LGBTQ+ communities. *Id.* The Policy also sends the message to employers that they will not be held accountable for certain types of discrimination against transgender employees, making it less likely that employers will implement strong protections against gender-identity discrimination. *Id.* ¶ 123. And, of course, the Policy discourages transgender employees from seeking justice from an agency that is dismissing their charges without even an investigation.

Consequently, FreeState has had to expend resources on alternative non-legal but labor-intensive services for its transgender clients who are experiencing workplace discrimination. *Id.* ¶¶ 127-30. Instead of using the EEOC process to attempt to redress discriminatory environments at its transgender clients' current workplaces, FreeState can continue serving these clients only through services such as reviewing resumes and helping with the job-search and application process. *Id.* ¶ 129-30. This result is harmful for transgender workers, FreeState, and workplaces across the state that will have fewer incentives and opportunities to ensure work environments free of harassment and other forms of discrimination.

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (internal citation omitted). And on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must accept as true the well-pleaded facts in the complaint and view the facts in the light most favorable to the plaintiffs, drawing all reasonable inferences in their favor. *See Lucero v. Early*, 873 F.3d 466, 469 (4th Cir. 2017). The complaint need contain only sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At this stage, the court "presum[es] that general allegations embrace those specific facts that are

necessary to support the claim." *Liberty Univ. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

## ARGUMENT

**I.    FreeState has standing to challenge the Trans Exclusion Policy.**

FreeState has adequately alleged that it has standing to sue on its own behalf.[5] Defendants' arguments to the contrary largely misconstrue FreeState's allegations and contest theories of injury that FreeState does not assert.

### A.    FreeState has alleged concrete injuries arising from the Trans Exclusion Policy.

An organization suffers an injury-in-fact "[w]hen an action 'perceptibly impair[s]'" its "ability to carry out its mission and 'consequent[ly] drain[s] . . . the organization's resources.'" *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). An organization may not manufacture injury by expending resources merely advocating against the defendant's actions, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024), but satisfies the injury requirement at this stage by alleging that the defendant's actions impeded its ability to provide "services" or conduct "core business activities," *id.* at 395 (citing *Havens*, 455 U.S. at 379).

#### 1.    *The Policy has impaired FreeState's ability to advocate for its transgender clients and advance the rights of transgender Marylanders.*

**a.** FreeState has adequately alleged that the Trans Exclusion Policy is perceptibly impairing its core activities, interfering with its "daily operations" and the "specific . . . work in which [it] is engaged," *PETA v. Dep't of Agriculture*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (citation omitted). The Policy undermines FreeState's work on behalf of its individual transgender clients who have

---

[5] FreeState does not assert that it has associational standing to challenge the Policy.

suffered workplace discrimination and its broader advocacy to curtail workplace discrimination statewide. *See* Compl. ¶¶ 99-126.

As a result of the Trans Exclusion Policy, the EEOC's charge-investigation process is no longer of use to many transgender charging parties, and so FreeState no longer advises its transgender clients to file charges of discrimination with the EEOC. Accordingly, FreeState can no longer carry out one of its core services for its transgender clients (helping them file and move through the EEOC charge-investigation process), and thus has lost an essential tool for providing legal assistance to its transgender clients experiencing workplace discrimination. FreeState and its clients have lost all the benefits of the charge-investigation process described above—production of evidence, possibility of settlement facilitated by the EEOC, and more. *See supra* at 2-5.

The loss of access to the EEOC's charge-investigation process impairs FreeState's ability to advance its mission in other ways as well. *See* Compl. ¶¶ 116-26. It deprives FreeState and its clients of information they would otherwise obtain through EEOC investigations, making it more difficult to pursue informal settlement or obtain pro bono representation for its clients. And losing access to employers' position statements and other EEOC-gathered evidence also deprives FreeState of information that supports its broader advocacy work to identify and eradicate employment discrimination, such as identifying patterns of employer practices or defenses to discrimination allegations. And by disincentivizing employees from utilizing FreeState's legal services to file charges at all, the Policy also reduces the number of people to whom FreeState can provide all types of services.

The court in *AFL-CIO v. Department of Labor*, 778 F. Supp. 3d 56 (D.D.C. 2025), rejected an argument virtually identical to the EEOC's position here. There, plaintiff organizations ceased recommending that their consumer clients use a particular CFPB tool, which the organization had

formerly relied on and encouraged its clients to use, when the agency allegedly began disclosing users' personal financial data. The court found that the organization had standing because the agency's action had "remove[d] 'an irreplaceable tool' for [an organization's] core activities," such that the organization could "no longer 'recommend'" that its clients utilize that tool. *Id.* at 75; *see also PETA*, 797 F.3d at 1094-97. The same is true here: the EEOC's Trans Exclusion Policy drastically limits, if not eliminates, the usefulness of the EEOC's charge-investigation process to FreeState and its transgender clients, impairing FreeState's ability to offer its core services.

Critically, it does not matter that FreeState may help its clients file charges with MCCR. As the Complaint explains, MCCR's charge-investigation process is not an equal substitute for the EEOC's, *see* Compl. ¶¶ 106-13. And regardless, an organization need not be "'entirely hamstrung' by an action to have standing to challenge it"—only "perceptibly impaired." *AFL-CIO*, 778 F. Supp. 3d at 75-76 (quoting *Capital Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 40 (D.D.C. 2020)) (finding organizational standing even though plaintiffs were not strictly "*precluded* from directing or helping their clients in filing CFPB complaints; they just [could not] do so in good faith").[6]

**b.** FreeState is consequently forced to expend additional resources to serve its transgender clients despite the Trans Exclusion Policy. *See* Compl. ¶¶ 127-32. For example, it now must provide alternative non-legal services for transgender people who are experiencing workplace discrimination, including job-search and application assistance to help them secure alternate employment if they cannot obtain redress from their current employer. In some instances, FreeState has also had to expend resources to file multiple charges of discrimination separately—

---

[6] Moreover, as described above, it is not clear whether or for how much longer MCCR will continue to accept charges of discrimination based on gender identity under Title VII. *See* Compl. ¶¶ 86-92.

one at MCCR involving gender-identity claims, and one at the EEOC involving other kinds of claims. *Id.* ¶¶ 118-19. Such splintering requires additional time and resources to undertake and maintain.[7] *Id.* ¶ 120. These resource expenditures are like those that courts have found to satisfy the diversion-of-resources element of organizational injury. *See, e.g.*, *PETA*, 797 F.3d at 1095-96 (expenditure of resources to investigate "alternative means" of redress for mistreated bird and filing of complaints with other "local, state, or federal agencies" because the Department of Agriculture would not act on its complaints of avian abuse satisfied diversion-of-resources requirement).

    In short, the Trans Exclusion Policy has diminished FreeState's ability to carry out its core work of advocating for the interests of transgender Marylanders and seeking redress for workplace discrimination that they have suffered. The Policy makes FreeState's representation of its clients more difficult and time-consuming, threatens to decrease the number of clients that FreeState will be able to serve and represent, and deprives it of information key to its educational and advocacy efforts. It has also required FreeState to redirect resources to keep serving its clients. These are precisely the sorts of allegations—interference by the government in nonprofits' core mission and regular operations—that courts have found sufficient to confer organizational standing. *See, e.g.*, *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024) (state's alleged failure to comply with federal voter security and access law impeded the RNC's voter-outreach work and caused it to divert resources to combatting election fraud in the state, satisfying injury requirement); *Edmondson Cmty. Org., Inc. v. Mayor of Baltimore*, No. 1:24-cv-01921, 2025 WL 2430345, at

---

[7] Dual filing may be all the more crucial if the EEOC ends its work-sharing agreements with FEPAs or adds untenable rules to such agreements. In that situation, FreeState would have to make sure transgender applicants and workers file charges with the EEOC to preserve their Title VII rights to go to court even though the agency would not investigate their charge, and still file with MCCR to get the benefit of some kind of charge investigation.

*13 (D. Md. Aug. 22, 2025); *Cath. Legal Immigr. Network, Inc. v. Exec. Office for Immigr. Review*, 513 F. Supp. 3d 154, 170 (D.D.C. 2021) (loss of clients and diversion of resources away from direct client service constituted "concrete drains on" the organization's "time and resources" sufficient to establish Article III standing); *N.W. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 46-47 (D.D.C. 2020) (standing found where rule would make it more difficult and time-consuming to serve existing clients, consequently reducing the number of clients they could serve).

### 2. *FreeState has suffered an informational injury.*

Denial of information that a statute requires disclosing also independently satisfies Article III's injury requirement. *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 166 (4th Cir. 2023) (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998)). An "organization suffers an injury in fact when it is deprived of information integral to its core activities." *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 475 (D. Md. 2019) (organizations had standing to challenge guidance that stopped agency from seeking and publicly disclosing information from regulated parties, where organizations would have used it to advance their missions). As explained *supra* at 3 & n.3, FreeState is entitled to obtain its clients' charge files (through FOIA or the EEOC's own regulations) at the conclusion of the EEOC's investigation. The Trans Exclusion Policy causes FreeState an informational injury because the EEOC's failure to conduct investigations prevents FreeState from obtaining this information—which, as described above, is "integral to its core activities" and ability to serve its clients—in its cases representing transgender workers. *See Am. Acad. of Pediatrics,* 379 F. Supp. 3d at 475.

### 3. *Defendants' arguments to the contrary are unavailing.*

**a.** Defendants do not contest that FreeState has effectively lost access to a key tool by which it carries out core activities to fulfill its mission. Instead, Defendants argue that an

organization's voluntary expenditure of resources in response to a government action does not—by itself—confer standing. Defs.' Br. 13-15.

But FreeState's standing does not rest on mere advocacy against Defendants' actions, or on a "unilateral and uncompelled choice to shift its resources away from its primary objective to address a government action," *RNC*, 120 F.4th at 395-96. Consistent with the two-part test for organizational injury, *see id.* (impairment of ability to carry out mission and consequent drain on resources), FreeState has alleged that its mission to serve its transgender clients has been frustrated by the effective loss of access to the EEOC's charge-investigation process and that it has been forced to expend additional resources to continue performing its core activities advocating for the rights and interests of transgender Marylanders.

**b.** Defendants also maintain that FreeState lacks any cognizable interest in enforcing Title VII's requirement that the EEOC investigate all charges of discrimination. They contend, at 11-12, that the investigation requirement is intended to protect the public interest to the exclusion of any interest of the charging party or the party's attorneys.

But Defendants' dichotomy is both artificial and unsupported by case law. The EEOC's abdication of its duties under Title VII works an injury to both the public interest *and* transgender charging parties and those who represent them. Indeed, the EEOC's processes provide extraordinarily important benefits to charging parties themselves and organizations like FreeState: opportunities for mediation, information-gathering, and more—all at no cost to the charging party. The case law that Defendants cite to establish that the EEOC, rather than the charging party, is "in command of the process" is hardly inconsistent with that point. While the EEOC has substantial discretion to decide how to deploy its enforcement resources, its investigative and enforcement

actions unquestionably benefit the individuals and organizations that have turned to it for redress *as well as* the public interest in eliminating workplace discrimination.

**c.** Defendants' remaining arguments regarding the EEOC's dismissal of several lawsuits it originally brought to vindicate the interests of transgender charging parties are likewise unavailing. Defendants say that FreeState "has no standing to challenge enforcement decisions that do not threaten it with prosecution." Defs.' Br. 11 (citing *United States v. Texas*, 599 U.S. 670, 677 (2023)). But even if Defendants' read of *Texas* were correct—which it is not, as explained *infra* at 16-19—FreeState does not allege that its injury stems from the EEOC's dismissal of any particular lawsuit originally brought on behalf of transgender charging parties (or any particular course of action with respect to a given charge of discrimination). Rather, FreeState challenges the EEOC's policy of categorically refusing to investigate and litigate certain types of charges asserted by transgender charging parties. The EEOC's dismissal of those several lawsuits is evidence of the EEOC's adoption and implementation of the Trans Exclusion Policy, and of Defendants' animus toward transgender charging parties.[8]

**B.  FreeState's injuries are redressable by the Court.**

Redressability is satisfied if "granting the requested relief would at least mitigate, if not eliminate, the alleged harm." *Sierra Club v. Dep't of Interior*, 899 F.3d 260, 285 (4th Cir. 2018). "[R]emoval of even one obstacle to the exercise of one's rights, even if other barriers remain," suffices. *Id.* Granting FreeState's requested relief would redress its injuries by removing a critical obstacle to obtaining the benefits of the Title VII-mandated investigation process for itself and its clients. *See* Compl. ¶¶ 99-133; *Winyah Rivers All. v. Active Energy Renewable Power, LLC*, 579 F. Supp. 3d 759, 766 (E.D.N.C. 2022) (redressability established where court order would "help

---

[8] The same is true of Defendants' argument, at 16-17, regarding FEPAs—FreeState does not assert injuries on behalf of or related to the FEPAs' loss of funding.

protect, and possibly restore" access to information that would help plaintiff "make more informed choices"); *Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 17 (D.D.C. 2018) (redressability satisfied where prevailing would "likely" result in plaintiff gaining access to at least some information it sought).

Defendants contend that FreeState's alleged injury would require the Court to interfere in EEOC decision-making regarding charge classification, investigation, and prosecution. Defendants confuse the exercise of investigative and prosecutorial discretion (which is generally within the Executive's purview and not subject to judicial review) with the adoption of a categorical policy about access to the EEOC's charge-investigation process based on a protected attribute (which is not). The requested relief does not require the Court to weigh in on how to classify or investigate any individual charge of discrimination, whether to initiate new litigation based on any particular charge, or whether to resuscitate any federal lawsuit challenging discrimination against transgender workers that the EEOC sought to withdraw from and dismiss with prejudice. FreeState requests only that the Court determine that the EEOC's Trans Exclusion Policy is unlawful and unconstitutional and set it aside. That would restore the EEOC's permissible enforcement discretion, not impair it.

## C. Defendants' enforcement discretion does not foreclose FreeState's standing.

Defendants assert, at 8-9, that FreeState lacks standing to challenge the EEOC's exercise of enforcement discretion, including its reasonable-cause determinations and decisions about which cases to prosecute. Defendants' argument proceeds from the fundamental misperception that FreeState seeks broad, intrusive review of the EEOC's discretionary enforcement decisions. FreeState in fact seeks judicial relief from the EEOC's unlawful policy of categorically excluding

an entire class of individuals from its usual protections with respect to certain kinds of claims.[9] And while federal agencies have broad discretion to allocate investigative resources, identify enforcement priorities, and prosecute cases, Defendants cite no law for the proposition that no party ever has standing to challenge an agency's categorical determination to foreclose a protected class from its usual charge-investigation process. By Defendants' logic, the EEOC could similarly decide not to investigate charges brought by Black charging parties, or women, or people with disabilities, or Christians, or any other protected class. The EEOC's discretion in enforcing workplace civil-rights laws does not empower it to deny the benefit of the investigative processes to one group of those workers, in violation of Congress's and the Supreme Court's decision to *include* them within the coverage of Title VII.[10]

**a.** Defendants' reliance on *United States v. Texas* is misplaced. In *Texas*, the Court held that plaintiffs (who relied on a statute directing the Department of Homeland Security to arrest and detain noncitizens with certain criminal convictions) lacked standing "to order the Executive Branch to alter its arrest policy so as to make more arrests." 599 U.S. at 674. This case is distinct from that "extraordinarily unusual lawsuit," 599 U.S. at 686, in several respects.

First, as already explained, FreeState does not ask the EEOC to take more enforcement actions—indeed, FreeState's injuries would not be redressed by a general increase in enforcement. Rather than seeking to constrain the EEOC's discretion, FreeState seeks to *remove* a categorical— and illegal—constraint on that discretion. *Cf. Phil. Yearly Mtg. of Rel. Soc'y of Friends v. DHS*, 767 F. Supp. 3d 293, 315 (D. Md. 2025) (*Texas*'s "general language about Article II authority" did

---

[9] That the EEOC still processes standalone claims of hiring, firing, or promotion-related discrimination because of gender identity does not save the agency, since it has denied transgender workers access to the standard charge-investigation process available to everyone else.
[10] FreeState further explains *infra* at 24-27 why Defendants' enforcement discretion does not bar review under the APA.

not foreclose plaintiffs' standing to challenge a broad DHS enforcement policy, where plaintiffs did not challenge the volume or prioritization of specific enforcement actions). *Texas* does not reach that kind of policy—a policy that does not involve issues of resource allocation or prudent docket management but instead categorically tosses out certain charges brought by a protected class of workers. *See also infra* at 24-27 (explaining why the Trans Exclusion Policy is not a matter committed to agency discretion by law).

Further, unlike in *Texas* where no "precedent, history, or tradition" supported the relief sought, the Supreme Court has confirmed that judicial review of the EEOC's compliance with Title VII is available. *Mach Mining* held that the EEOC's compliance with its duty to attempt conciliation under § 2000e-5(b) was subject to judicial review. 575 U.S. at 483. Though the "scope of that review is narrow," it is the *how* and not the *whether* that is left to the agency's discretion. *Id.* Moreover, as explored in more detail below, *see infra* at 27-29, FreeState's claims all come with judicially manageable standards for the Court to apply.

Finally, as *Texas* itself acknowledged, "the standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions." *Texas*, 599 U.S. at 682. Such "an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id.* at 683. That is exactly what FreeState alleges here—a targeted abdication that picks out a class of workers to deprive certain of their claims of the normal process that any other charging party would enjoy. On its own terms, then, *Texas* does not apply.

**b.** The remaining cases Defendants cite do not save their argument. *Heckler v. Chaney*, 470 U.S. 821 (1985), and *Interstate Commerce Commission v. Locomotive Engineers*, 482 U.S. 270 (1987)—both APA reviewability cases—do not bear the weight that Defendants would assign

them for their APA reviewability arguments (which FreeState addresses *infra* at 24-27), much less their standing arguments. And *George Banata Co. v. NLRB* involved a question of statutory interpretation: whether a decision by the general counsel of the National Labor Relations Board not to reinstate a complaint in a specific case was a reviewable final order of the Board. *See* 626 F.2d 354, 356–57 (4th Cir. 1980). That decision did not address standing, nor did it involve the kind of categorical agency conduct challenged here.

The EEOC cites other cases emphasizing executive control over prosecution and enforcement decisions, but those cases also do not advance its argument. *Trump v. United States* established presidential immunity from certain criminal prosecutions, and in so doing noted the President's status as head of the Executive Branch. *See* 603 U.S. 593, 620 (2024). But FreeState is not seeking judicial review of any decision by the President; nor does the EEOC—an independent agency—claim that its Trans Exclusion Policy was compelled by the President.[11] And *Buckley v. Valeo*, 424 U.S. 1, 137-40 (1976), in relevant part, addressed the constitutionality of the statutory appointment process for Federal Election Commissioners, which turned on whether the FEC exercised "legislative" or "executive" powers. To the extent Defendants cite these cases to establish that investigations and enforcement actions are powers of the Executive Branch, the authority is irrelevant here. Classifying a power as "executive," on its own, does not establish that any action in furtherance of that power is unreviewable by the courts. *Cf. Mach Mining*, 575 U.S. at 488 ("Yes, the statute provides the EEOC with wide latitude over the conciliation process . . . . But no, Congress has not left *everything* to the Commission." (citation omitted)).

---

[11] In all events, an agency cannot evade judicial review of its unlawful actions by claiming that it was merely enforcing an executive order. *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

## II.    FreeState's claims are reviewable under the APA.

The APA creates a "strong presumption in favor of judicial review of agency action." *Casa de Maryland v. DHS*, 924 F.3d 684, 697 (4th Cir. 2019) (citation omitted). "[F]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The APA's use of "action" covers "comprehensively every manner in which an agency may exercise its power," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001), including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," *City of New York v. Dep't of Defense*, 913 F.3d 423, 431 (4th Cir. 2019).

The Trans Exclusion Policy is discrete, final agency action for which FreeState has no alternative remedy in a court, and the Policy does not fall under the narrow "committed to agency discretion by law" exception to reviewability, 5 U.S.C. § 701(a)(2).

### A.    The Trans Exclusion Policy is discrete, final agency action.

#### 1.    *The Policy is sufficiently discrete.*

The APA's discreteness requirement ensures that courts are not "forced either to enter a disfavored 'obey the law' injunction" or "to engage in day-to-day oversight of the executive's administrative practices" stemming from a challenge to an agency's workaday managerial decisions. *City of New York*, 913 F.3d at 431. For example, a party that seeks to compel an agency's "more thorough" compliance with a statute stemming from "widespread and systemic" failures rather than a specific action—and to do so through a judicially managed general improvement plan—has likely failed to identify a discrete policy. *See City of New York*, 913 F.3d at 427, 433-34. Ditto a party asking the court to adjudicate "abstract policy disagreements" where the court lacks the "expertise and information to resolve" such disagreements. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004).

FreeState asks for no broad, programmatic relief that would require this Court to manage

the EEOC's day-to-day operations or entangle the Court in abstract policy questions. FreeState challenges a specific agency decision—the Trans Exclusion Policy—and its challenge is limited to "'*whether*,' not '*how*,'" the agency satisfies its statutory and constitutional duties under the Policy. *Child Trends, Inc. v. Dep't of Educ.*, No. 8:25-cv-01154, 2025 WL 2379688, at *7 (D. Md. Aug. 15, 2025). Contrary to Defendants' argument, at 19-20, FreeState's allegations regarding specific actions by the EEOC in its own cases, and the EEOC's directives to state FEPAs, are examples of the Trans Exclusion Policy in action, not the subjects of FreeState's APA challenge. *See supra* at 14-18; *cf. Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1206-07 (S.D. Cal. 2019) (inferring existence of asylum policy based on statements from high-level government officials and record of asylum seekers turning back along the border); *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 174-76, 184-85 (D.D.C. 2015) (inferring policy of considering deterrence in making custody determinations). The Trans Exclusion Policy is not mere shorthand for "the day-to-day operations of the Commission," Defs.' Br. 19 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990)); it is a specific policy "applying some particular measure across the board" that "can of course be challenged under the APA." *Lujan*, 497 U.S. at 890 n.2. And the relief FreeState seeks—vacatur of the Policy, *see* Compl. at 40—is the sort of relief that courts issue every day.

### 2. The Policy is final.

Agency action is final if it (1) "marks the consummation of the agency's decision-making process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). Courts take a "pragmatic approach" to finality. *Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (citation omitted). FreeState has adequately pleaded final agency action here.

**a.** The Trans Exclusion Policy is not "merely tentative," *Bennett*, 520 U.S. at 178, or "advisory in nature," *Hawkes*, 578 U.S. at 597. EEOC staff are adhering to the Policy now in denying transgender charging parties the same investigation as cisgender charging parties. That the Policy has "purportedly shifted over time," Compl. ¶ 128, does not make it less final—that a policy may be revised at some point "does not make an otherwise definitive decision nonfinal." *Hawkes,* 578 U.S. at 598. And though the Policy's finer details may be revealed by the administrative record or through discovery, that those details are "still unclear" does not insulate it from review. *See Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008).

*EPA v. Brown*, 431 U.S. 99 (1977), does not compel a different answer. There, the Supreme Court addressed regulations that were to be modified by announced-but-as-yet-unpublished rescissions of key provisions. *Id.* at 103. The Supreme Court declined to review those hypothetical, future regulations. *Id.* at 103-04. But allegations explaining that a policy's specific details evolved over time (as here) are not the same as allegations that key changes are yet to come.

**b.** The Trans Exclusion Policy determines legal rights or obligations, *Bennett*, 520 U.S. at 177-78. First, insofar as the Trans Exclusion Policy represents an interpretation of Title VII, it is a binding retraction of its own "discretion to adopt a different view of the law" from which legal consequences flow. *Texas v. EEOC*, 933 F.3d 433, 437-39, 442-46 (5th Cir. 2019) (holding that a guidance document that "b[ound] EEOC staff to an analytical method in conducting Title VII investigations and direct[ed] their decisions about which employers to refer for enforcement actions" to be final agency action).

Although the foregoing is sufficient to establish finality, the Trans Exclusion Policy also has legal consequences because it "alter[s] the legal regime to which" the EEOC, FEPAs, FreeState, and FreeState's clients are all subject, *Bennett*, 520 U.S. at 178. Title VII requires the

21

EEOC to investigate discrimination claims filed by workers and determine whether there is probable cause to believe that they have merit. *See* 42 U.S.C. § 2000e-5(b). As part of that investigation, the EEOC may ask the employer and third parties to submit a position statement, personnel policies and files, and other relevant documents, which the EEOC then produces to the employee as part of the investigative file. Compl. ¶¶ 45, 102. The EEOC's broad subpoena power also enables it to secure relevant evidence from other parties during the investigations, which may also be contained in the investigative file, *McLane Co.*, 581 U.S. at 76-77. Should the EEOC decide that probable cause exists, the charging party would benefit from a number of additional agency resources, including confidential conciliation efforts at the EEOC's expense, *see* 42 U.S.C. § 2000e-5(b).

The Trans Exclusion Policy alters that legal regime by categorically excluding certain charges filed by transgender workers from that investigation process right at the threshold. As described above, this exclusion strips FreeState of access to an irreplaceable process for combatting workplace discrimination and fostering safety and inclusion for LGBTQ+ Marylanders. *See supra* at 9. And the Policy's change to the EEOC's FEPA-reimbursement practices similarly alters the legal regime in which those FEPAs operate by eliminating a category of charges for which they are eligible for reimbursement.[12]

Defendants' authority addresses whether individual EEOC charge-investigation decisions are final agency action and so misses the point. *See Georator Corp. v. EEOC*, 592 F.2d 765 (4th Cir. 1979) (individual reasonable-charge determination); *Bell Atl. Cash Balance Plan v. EEOC*,

---

[12] The fact that the FEPAs themselves are not present in this suit does not change the finality of the Trans Exclusion Policy's imposition of legal consequences on them. *See Texas*, 933 F.3d at 444 ("Finality, however, cannot vary depending on who sued the agency; it depends on the rule itself.").

No. 97-2382, 1999 WL 485679 (4th Cir. July 12, 1999) (decision to investigate charge); *Freeman v. Beverly*, No. 8:19-cv-01784, 2020 WL 2747392 (D. Md. May 27, 2020) (alleged failure to adequately investigate charge).

### B.  FreeState has no adequate alternative remedy in court.

Defendants argue, at 22-23, that FreeState cannot bring its claims under the APA because its clients are free to bring Title VII suits against their employers in court. Such a lawsuit is not an adequate alternative remedy for the EEOC's unlawful policy. FreeState is not suing an employer for discrimination; it seeks review of the EEOC's decision to abdicate its core duties and foreclose transgender workers from the full set of Title VII-mandated investigations and processes that other charging parties enjoy. The private lawsuit hypothesized by Defendants would not offer FreeState relief of the "same genre," *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009), that it seeks here—vacatur of the Trans Exclusion Policy.

The Fourth Circuit has explained that the existence of an alternative remedy will not displace APA review when there is a mismatch between the targets of the claims and the relief sought. *See King v. Burwell*, 759 F.3d 358, 366-67 (4th Cir. 2014), *aff'd*, 576 U.S. 473 (2015). For example, an APA challenge to an IRS rule authorizing tax credits is not displaced by tax-refund actions—even where the same rule could theoretically be challenged through such actions—since a challenge to a final agency action is "simply not a typical tax refund action." *Id.* at 363-67. A contrary result would create the kind of obstacle to judicial review that the APA was designed to remove. *Id.* at 367.

So here too. FreeState challenges the legality of a final agency action that broadly eliminates investigations of certain discrimination charges only when brought by transgender workers. And unlike in *King*, Defendants do not even suggest that FreeState or its clients could challenge that policy through a Title VII claim against an employer. A standard Title VII

employment discrimination claim against an employer cannot accomplish vacatur of a rule under the APA, *see* 5 U.S.C. § 706. And Title VII is not an "existing procedure[ ] for review of *agency* action" that would be duplicated by FreeState's APA claims. *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (emphasis added).

### C.    The final agency action was not committed to agency discretion by law.

The APA's strong presumption of judicial review may be overcome if the challenged action is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). This exception is construed "quite narrowly," since courts "could never determine that an agency abused its discretion [under 5 U.S.C. § 706(2)(A)] if all matters committed to agency discretion [are] unreviewable." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018). The exception applies only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019).

**a.** Defendants contend that the Trans Exclusion Policy is committed to agency discretion and unreviewable because it concerns the EEOC's enforcement discretion and decision-making. Defendants' reliance on *Heckler* and related case law is misplaced.

*Heckler* held that an agency's decision to take or not to take enforcement action in a specific instance is "the special province of the Executive Branch." 470 U.S. at 832. That is because such decisions involve weighing factors courts are ill-suited to evaluate, such as whether the agency is likely to successfully remediate a violation, whether to prioritize such remediation, and whether to spend scarce resources on that particular violation. *Id.* at 831-32. But the Court did not hold that an agency has unreviewable authority to make sweeping policy determinations about enforcement or nonenforcement, even as it has discretion to choose to enforce, or not, in a particular instance. *See id.* at 833 n.4. Nor did it deny reviewability when an agency "'consciously and expressly

adopt[s] a general policy'" of enforcement or nonenforcement. *Id.* at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc) (per curiam)).

Fourth Circuit case law confirms this distinction between "single-shot non-enforcement decision[s]" and across-the-board agency policies. *See Casa De Maryland*, 924 F.3d at 698-99 (citation omitted) (rescission of DACA was reviewable as "a general enforcement policy in existence for over five years and affecting hundreds of thousands of enrollees based on the view that the policy was unlawful"). General statements of policy "are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are . . . peculiarly within the agency's expertise and discretion." *Id.* at 699 (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994)). Therefore, "an agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to review." *Id.*

FreeState challenges a general enforcement policy—one that departs from individualized, merits-and-policy-laden processes and instead makes categorical determinations about charges filed by one group of protected workers. Evaluating the Trans Exclusion Policy will not require the Court to second-guess any EEOC judgments about resource allocation, a particular claim's odds of success, or alignment with overall priorities. The Court need only evaluate whether the Trans Exclusion Policy is contrary to Title VII and the Equal Protection Clause, is arbitrary and capricious, and was improperly promulgated without notice and comment. Courts are well suited to address those questions.

Defendants' ostensibly contrary case law is irrelevant. *Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310 (4th Cir. 2008), is distinguishable "because it

involved a discretionary enforcement decision in an individual case," *Casa De Maryland*, 924 F.3d at 698 n.9. The same is true of *Sierra Club v. Larson*, which dealt with a claim that an agency failed to enforce a highway-beautification statute against South Carolina. *See* 882 F.2d 128, 129 (4th Cir. 1989). And *ICC v. Locomotive Engineers* held only that "where a party petitions an agency for reconsideration on the ground of material error . . . an order which merely denies rehearing of the prior order is not itself reviewable." *Casa de Maryland*, 924 F.3d at 700 (citation modified). That case "does not advance the government's argument" here, where FreeState "filed a timely challenge to the government's *original* decision"—the Trans Exclusion Policy—and where the challenged action "involves a broad enforcement policy, not an individual decision." *Id.* at 701.

Finally, as already explained, FreeState's allegations concerning specific examples of the EEOC's policy in action do not change the nature of its challenge and are "relevant insofar as [they] illuminate[ ] the nature of the policy." *Venetian Casino Resort,* 530 F.3d at 931; *see also supra* at 14-18.

**b.** Even if the Trans Exclusion Policy implicated the EEOC's enforcement discretion (which it does not), it still would not foreclose review of FreeState's constitutional, statutory, and procedural APA claims.

An "agency decision that violates a statutory or constitutional command . . . is not immune from judicial review even when a lawful exercise of an agency's discretion has that immunity." *Elecs. of N.C. v. S.E. Power Admin.*, 774 F.2d 1262, 1267 (4th Cir. 1985). "Even where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations." *Id.* (quoting *Garcia v. Neagle*, 660 F.2d 983, 988 (4th Cir. 1981)); *Inova*

*Alexandria Hosp. v. Shalala*, 244 F.3d 342, 347 (4th Cir. 2001) (the court "clearly ha[d] manageable standards to review" the constitutional, statutory, and notice-and-comment claims).

*Constitutional claim:* The Court may review FreeState's constitutional claim because "it is well settled that even if agency action is committed to its discretion by law, a court may still determine whether the action is constitutional." *Id. Heckler* explicitly left room for constitutional claims. 470 U.S. at 838 (explicitly "not address[ing] the issue that would be raised" if a "colorable" constitutional claim had been made); *see also id.*, at 839 (Brennan, J., concurring) (explaining that majority did not address cases where "an agency engages in a pattern of nonenforcement of clear statutory language" or where "a nonenforcement decision violates constitutional rights"); *Lincoln v. Vigil*, 508 U.S. 182, 195 (1993) ("[T]he APA contemplates, in the absence of a clear expression of contrary congressional intent, that judicial review will be available for colorable constitutional claims."). FreeState has alleged an APA claim under the Fifth Amendment's Due Process Clause, and "the Due Process Clause provides a manageable standard that allows for review." *Inova Alexandria Hosp.*, 244 F.3d at 347.

*Quorum claim:* FreeState's quorum claim simply requires the Court to determine whether the EEOC exercised powers of the Commission by abdicating its duties in the ways alleged without a "quorum" of "three members." *See* 42 U.S.C. § 2000e-4(c). With respect to this part of the claim, the Court is not required to do any "complicated balancing of a number of factors which are peculiarly within" the EEOC's expertise, *Heckler*, 470 U.S. at 831-32—only to determine that the EEOC had fewer than three commissioners when it implemented the Policy.

*Notice-and-Comment claim:* The Court may likewise review FreeState's notice-and-comment claim. "Because this claim turns on whether the APA requires such a rule to be promulgated under the notice and comment procedure, the APA provides the statutory standard

27

for [the Court's] analysis." *Inova Alexandria Hosp.*, 244 F.3d at 347 (citation omitted); *see also Lincoln*, 508 U.S. at 195-98 (analyzing procedural notice-and-comment claims on the merits even where challenged agency action was not substantively reviewable).

**c.** In all events, Title VII provides the requisite judicially manageable standard for FreeState's substantive Title VII and its arbitrary-and-capricious claims. The Supreme Court has already held that the word "shall" in Title VII, 42 U.S.C. § 2000e-5(b), is "mandatory." *Mach Mining*, 575 U.S. at 486 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002), for proposition that "the word 'shall' admits of no discretion"). And the "Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes." *Azar v. Allina Health Servs.,* 587 U.S. 566, 574 (2019). Title VII's instruction that the agency "shall make an investigation" upon receiving a charge—located in the same statutory provision as the "shall" that *Mach Mining* construed—is therefore likewise mandatory. 42 U.S.C. § 2000e-5; *see also Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 359 (1977) (explaining that once a charge is filed, the "EEOC is then required to investigate the charge and determine whether there is reasonable cause to believe that it is true").

Title VII thus provides judicially manageable standards to evaluate FreeState's Title VII claim, which does not challenge *how* the EEOC is fulfilling its statutory duties but instead alleges that the agency is not fulfilling them at all with respect to certain EEOC charges brought by one protected group. *See* Compl. ¶ 177; *Am. Acad. of Pediatrics*, 379 F. Supp. 3d at 485 (where statute contained "mandatory language," including "shall," agency's nonenforcement decision was reviewable).

For the same reason, the Court may review FreeState's arbitrary-and-capricious claim. This claim does not argue that the Trans Exclusion Policy is unwise, but that it departs without

explanation from the commands of Title VII laid out above as well as from binding constitutional precedent and existing EEOC regulations. *See* Compl. ¶¶ 167-73; *cf. Weyerhaeuser Co.*, 586 U.S. at 23-24 ("[T]his case involves the sort of routine dispute that federal courts regularly review: An agency issues an order affecting the rights of a private party, and the private party objects that the agency did not properly justify its determination under a standard set forth in the statute."). These authorities provide judicially manageable standards against which to measure FreeState's claim.

### III. FreeState has adequately alleged that the Trans Exclusion Policy violates Title VII and the APA.

**a.** Defendants fleetingly assert, at 29, that parts of Counts I and IV should be dismissed because the EEOC satisfies its Title VII obligation simply by categorizing charges by one group of protected workers on their face as "C" charges. Not so. An "investigation" under 42 U.S.C. § 2000e-5(b) requires more than determining whether a charging party is a member of a disfavored protected class, and if so, classifying such charges as meritless (effectively tossing them out). *See McLane Co.*, 581 U.S. at 75 (("When it receives a charge, the EEOC must first notify the employer, and must then investigate *to determine whether there is reasonable cause to believe that the charge is true*." (citation modified)). Because Title VII imposes mandatory duties on the EEOC in the charge-investigation process—including a duty to investigate—and because FreeState has adequately alleged that the EEOC has failed to uphold these duties, no parts of Counts I or IV should be dismissed for failure to state a claim.

**b.** Defendants also erroneously contend, at 29-30, that the Trans Exclusion Policy was not required to go through notice-and-comment rulemaking. The "critical question in distinguishing between legislative rules" (which are subject to notice-and-comment) and "general statements of policy" (which are not) is "whether the statement 'is of present binding effect.'" *Casa de Maryland*, 924 F.3d at 702 (quoting *Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir.

2011)). Legislative rules "supplement[] a statute, adopt[] a new position inconsistent with existing regulations, or otherwise effect[] a substantive change in existing law or policy.'" *Id.* (citation omitted). Interpretive ones "advise the public prospectively" regarding how an agency "proposes to exercise a discretionary power" and only "remind affected parties of existing duties." *Id.* (citation omitted). The Trans Exclusion Policy "effects a substantive change in existing law or policy." *Id*. The Policy marks a departure from existing EEOC authorities, guidance, and operating procedures. Defendants' arguments on this point suffer the same defects as their procedural and jurisdictional arguments: they mischaracterize FreeState's claims as challenging the EEOC's authority to exercise enforcement discretion with respect to individual investigative decisions. But the Trans Exclusion Policy is a categorical policy denying one protected group the full benefits and protections of the charge-investigation process required under Title VII.

**c.** Defendants' arguments on the lack of a quorum falter for the same reason. While quorums may not be necessary for "administrative operations of the Commission" or "determinations on" individual charges, Defs.' Br. 28-29, the Trans Exclusion Policy is neither. It reflects a substantive exercise of Commission authority to effect a categorical policy change. A quorum was required.

## CONCLUSION

For these reasons, the Court should deny the government's motion to dismiss.

Dated: November 10, 2025

Respectfully submitted,

*/s/ Sarah R. Goetz*

Lauren Khouri (Bar No. 19549)
Rachel Smith*
Elizabeth Theran*
Gaylynn Burroughs*
NATIONAL WOMEN'S LAW CENTER
1450 I Street NW, Suite 700
Washington, DC 20005
Phone: (202) 571-8735
Fax: (202) 588-5185
lkhouri@nwlc.org
rsmith@nwlc.org
etheran@nwlc.org
gburroughs@nwlc.org

*Admitted *pro hac vice*

Sarah Goetz (Bar No. 31570)
Audrey Wiggins (Bar No. 31620)
Sunu Chandy (Bar No. 31569)
J. Sterling Moore (Bar No. 31562)
Paul R.Q. Wolfson (Bar No. 31856)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
sgoetz@democracyforward.org
awiggins@democracyforward.org
schandy@democracyforward.org
smoore@democracyforward.org
pwolfson@democracyforward.org

*Counsel for* Plaintiff

**CERTIFICATE OF SERVICE**

I, Sarah Goetz, hereby certify that I today filed the foregoing document with the Clerk of the Court for the United States District Court for District of Maryland by using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users who have appeared in this case.

/s/ *Sarah R. Goetz*
*Counsel for Plaintiff*